E-FILED
Wednesday, 15 February, 2017 09:09:28 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

FEB 1 4 2017

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JACQUELINE TANNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.: 17-3039 |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITYOF ILLINOIS; THE** | ) | |
| **UNIVESITY OF ILLINOIS** | ) | |
| **SPRINGFIELD; KAREN MORANSKI,** | ) | |
| **Associate Vice-Chancellor, in her** | ) | |
| **Official and Individual Capacity; and** | ) | |
| **JONATHAN GOLDBERGBELLE,** | ) | |
| **Senior Director of International** | ) | |
| **Programs and Internships, in his** | ) | **JURY TRIAL** |
| **Official and Individual Capacity;** | ) | **DEMANDED** |
| **LAURA ALEXANDER, Senior Director** | ) | |
| **Of Human Resources in her** | ) | |
| **Official and Individual Capacity; and** | ) | |
| **DONNA MCNEELY, Director of** | ) | |
| **University Ethics and Compliance** | ) | |
| **Office in her Official and Individual** | ) | |
| **Capacity,** | ) | |
| | ) | |
| Defendant(s). | ) | |

## COMPLAINT AT LAW

Now comes, Plaintiff, Jacqueline Tanner, by and through her attorneys of record, S. Mona

Ahsan and Kathryn E. Eisenhart and for her Complaint at Law, states as follows:

### NATURE OF THE ACTION

1. This action is brought to remedy unlawful discrimination practices under Title VII of the

   Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; violations of Due Process

   under the Fourteenth Amendment of the U.S. Constitution; and Conspiracy under 42

   U.S.C. §1985; State Officials and Employees Ethics Act 5 ILCS 430/15-5 *et seq*.; the

   Whistleblower Act, 740 ICLS 741/1, *et seq.*; and for breach of contract. Plaintiff seeks

   injunctive relief including, but not limited to: back pay and reinstatement to her prior

1

position, other make-whole relief, compensatory damages against all Defendants, and

punitive damages against Defendants Moranski, GoldbergBelle, Alexander and McNealy.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, and 42 U.S.C. §2000e-

5(f)(3). Supplemental jurisdiction is conferred by 28 U.S.C. §1367 for Plaintiff's state law

causes of action.

3.  Venue is proper in the Springfield Division of the Central District of Illinois because the

employment practices hereafter alleged to be unlawful were committed within this judicial

district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.  Plaintiff has exhausted all of her administrative remedies prior to bringing this lawsuit.

5.  Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") and received a Right to Sue Letter from the EEOC on Nov 21,

2016, a true and correct copy of which is attached as Plaintiff's EXHIBIT A. The Right to

Sue Letter was issued as a result of the charge of discrimination filed by the Plaintiff and

received by the EEOC on May 11, 2016, a true and correct copy of which is attached as

Plaintiff's EXHIBIT B. All allegations of said charges and exhibits are incorporated by

reference hereto.

## PARTIES

6.  Plaintiff, Jacqueline Tanner is a Citizen of the United States who, at the time of the events

in question, resides in Cass County, Illinois.

7.  Plaintiff is an "employee" within the meaning of Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e *et seq*.

8. During all relevant times, Defendants, Board of Trustees of the University of Illinois and The University of Illinois Springfield, collectively referred to as "The University" or "University", constitutes a corporation whose missions include teaching, research, and public service in many academic disciplines.

9. The University is a covered entity within the meaning of the Civil Rights Act of 1866. The University is an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

10. At all relevant times, Defendant Karen Moranski was the Associate Vice-Chancellor of Undergraduate Education at the University of Illinois Springfield.

11. At all relevant times, Defendant Jonathan GoldbergBelle was the Senior Director of International Programs and Internships.

12. At all relevant times, Defendant Laura Alexander was the Senior Director of Human Resources.

13. At all relevant times, Defendant Donna McNeely was the Director of the University Ethics and Compliance Office.

## STATEMENT OF FACTS

14. Plaintiff began her employment with the University of Illinois Springfield (University) as a part time Adjunct Instructor on August 16, 2011, to teach in the Intensive English Program (IEP) at the Center for Teaching and Learning (CTL). The Intensive English Program (IEP) was located within the CTL which also consisted of university wide tutoring programs. At this time, CTL was in College of Liberal Arts and Sciences (CLAS) and the Dean of CLAS, James Ermatinger (Dean) was in charge of IEP.

15. August 16, 2011, Plaintiff was first hired by Ms. Dana Atwell (Atwell), Associate Director ESL Coordinator, who was her immediate supervisor until about June 2013, when Atwell left the program.   Around July 2013 through April 27, 2016, Driss El-Akrich, Interim Director (El-Akrich), was her immediate supervisor.

16. The purpose of an Intensive English Program (IEP) is to provide high quality teaching of English to speakers of other languages. That is to provide non-native speakers the language skills they need to study at an American university.

17. The courses in IEP are non-credit bearing and completion of the program doesn't guarantee admission into the University. Students need to receive a passing score on an English proficiency test to gain admission into the University. They may take the University examination, Michigan English Language Institute College English Test (MELICET), offered each semester or an acceptable test from an outside source such as, Test of English as a Foreign Language (TOEFL).

18. Therefore, the purpose of IEP is to prepare these non-native speakers to pass one of the aforementioned tests in order to be admitted into the University.

19. It was the University's policy that successful completion of the IEP curriculum did not fulfill the English proficiency requirements for international students; instead, students were required to take the aforementioned tests to enroll in the University.

20. Plaintiff is a qualified professional in second language learning with 25 years of second language learning experience. She has a degree in Foreign Language and training in English as a Second Language teaching. Additionally, she had experience teaching college level English Composition. She also has 15 years' experience teaching in IEP/ESL

4

programs. Prior to coming to University she taught at Western Illinois University's (WIU) accredited ESL program and is familiar with the standards for IEP accreditation.

21. From August 16, 2011, until January 16, 2014, Plaintiff was a part-time Adjunct Instructor.

22. On January 16, 2014, Plaintiff was promoted to full time faculty, given a raise and rehired as a Visiting Clinical Instructor with "special responsibilities" in the Intensive English Program (IEP). The special responsibilities entailed the setting up policies and procedures as required by the Commission on English Language Program Accreditation (CEA) for the IEP Department. It was the University's plan to seek and acquire CEA accreditation for the IEP and to meet the same standards as the IEP/ESL Programs at the University's Chicago and Urbana campuses.

23. In January 2014, Plaintiff's immediate supervisor was El-Akrich, Interim Director of IEP who reported to the Dean of CLAS.

24. On February 2, 2016, Plaintiff was told by Moranski that Plaintiff was being promoted to the position of Visiting Academic Coordinator. She was informed on February 5, 2016 that the contract was ready and she had to sign it that day or lose all of her benefits.

25. In March of 2013, before Atwell left, El-Akrich was sent as University liaison to Saudi Arabian Cultural Mission (SACM) in Washington D.C., because he was a native Arabic speaker and Muslim; therefore, he understood the Arabic culture and the needs of Saudi students and the requirements of the University. He was sent to SACM to request that the University and the IEP be placed on SACM's list of approved colleges. This visit was approved by the Dean.

26. SACM provides scholarships and stipends for Saudi students but only if the students attend Universities and Programs on the list approved by SACM. Plaintiff and El-Akrich believed

such approval would increase enrollment and add diversity, as per University's own numerous directives, at the University. El-Akrich obtained approval for the University and IEP from SACM at the time of his visit.

27. Based on the approval from SCAM the IEP grew from about 8 – 10 students to about 55 – 60 students per semester over the next two years.

28. The faculty members increase from 3 to 9.

29. In 2014, it was decided by the Dean with the support and approval of the Provost and Vice-Chancellor, Lynn Pardie, (Provost) that the IEP should seek CEA accreditation.

30. Based upon the growth of the IEP and the effort to obtain CEA accreditation, the Dean requested that three full-time faculty be hired.

31. On July 1, 2015, the IEP underwent a re-organization; and on that date it was no longer part of CLAS but was part of the Center for Academic Success (CAS) and under Defendant Jonathan GoldbergBelle (GoldbergBelle) the Senior Director of International Programs and Internships. GoldbergBelle reported directly to Defendant Karen Moranski, (Moranski) Associate Vice-Chancellor of Undergraduate Education. However, El-Akrich, as the Interim Director of IEP, remained Plaintiff's immediate supervisor.

32. Prior to IEP being transferred to CAS, an assessment of the IEP was done by GoldbergBelle. The Provost, Lynn Pardie, wanted all the departments under Center for Academic Success (CAS) assessed. IEP was scheduled to be the first assessed because it had faced rapid growth. The thought being that the strategies used by IEP could be emulated by other departments to increase their enrollment.

33. GoldbergBelle focused his assessment interview with Plaintiff on student attendance. Plaintiff explained to GoldbergBelle that El-Akrich followed the same guidelines as had his

6

predecessor, Atwell. When students missed classes all teachers reported these absences to El-Akrich. If there was an issue and El-Akrich was not able to contact the student, he would ask the International Student Services (ISS) for assistance. This had been the practice under Atwell.

34. Plaintiff explained to GoldbergBelle that CEA guidelines for assessing students was based on direct evidence demonstrating how well a student met the student's learning outcomes in a given course or at a given level. Direct evidence included standardized test, comprehensive exams, portfolios, rubrics, or scales, but did not include attendance.

35. On or about August 3, 2015, Plaintiff reported to Moranski the discriminatory behavior by GoldbergBelle and his Program Coordinator, Barbara Sykes against El-Akrich. This complaint dealt specifically with discriminatory actions against El-Akrich and the Mexican exchange students from the Proyecta program. The Proyecta program was a short term program for Mexican students to come to the University for a month to study English. It was a program initiated by President Obama and the Mexican government.

36. During that meeting, Plaintiff reported that it was her opinion that GoldbergBelle was treating El-Akrich very differently than his white, female predecessor and that it was her opinion that such treatment was based upon El-Akrich's national origin and religion.

37. Moranski did not investigate the complaint of discrimination.

38. On October 21, 2015, Plaintiff reported discrimination against the Middle Eastern Muslim students by GoldbergBelle and two IEP adjunct teachers to Ms. Lucia Vasquez, (Vasquez) Assistant Dean of the College of Liberal Arts and Sciences.

a. Specifically, Plaintiff reported that GoldbergBelle was fixated on Middle Eastern Muslim student absences and insisted that teachers report such absences directly to him and not to El-Akrich, in contravention of the practices of IEP and the CEA guidelines.

b. Plaintiff reported to Vasquez that GoldbergBelle made statements about a Middle Eastern student that because of his absences from one of the classes the student should be deported. Such concerns did not apply to two Chinese students who did not attend classes for almost a semester.

c. Sue Alexander (Sue) and Rebecca Damery (Damery), adjunct faculty in IEP reported student absences only to GoldbergBelle.

d. GoldbergBelle treated El-Akrich very differently than his white, female, predecessor Atwell had been treated, including keeping El-Akrich out of the information loop necessary for him to perform his duties as Interim Director.

e. Plaintiff noted that there was a disparity between the grades and progression reports received by two Middle Eastern students and a female Vietnamese student in Sue's class. All three students had failing grades in Sue's class but Sue reported that the Vietnamese student should move up to the next level, but the Middle Eastern Muslim students should not. Plaintiff had all three students in her class and based upon their test grades, which measured proficiency, she determined all three should move up to the next level.

f. Damery refused to allow a Middle Eastern Muslim student to attend her class even though he was on her class roster. She ordered him to get a note from the IEP office to verify that he was correctly placed in her class, even though she knew there was no staff in the office.

8

g.The Middle Eastern Muslim student complained to Plaintiff about Damery's treatment and she reported the complaint to El-Akrich.

h.However, on the same day, Damery did allow a female Chinese student to remain in a class even though there was a question as to whether she was at the correct class level. The student was not ordered to get a note from the IEP office to verify that she was in the proper class.

39. Moranski was angry when she became aware that Plaintiff had spoken to Vasquez in the Dean's office and told El-Akrich that Plaintiff should not have gone out of the chain of command to report the discrimination

40. On or about November 10, 2015, Plaintiff met with Moranski and reported the incidents of
    discrimination she had discussed with Vasquez in the Dean's office. Plaintiff also reported
    that GoldbergBelle was not following established procedures as per CEA guidelines.

41. On November 13, 2015, students came to Plaintiff's office to complain about treatment by
    certain IEP faculty including Sue and Damery. Plaintiff took notes, typed up the
    complaints and sent them to El-Akrich. Shortly thereafter, El-Akrich reported the students'
    complaints of discrimination to Moranski and GoldbergBelle during a meeting where
    hiring faculty with prior teaching experience in a CEA accredited program was discussed.
    Both GoldbergBelle and Moranski agreed to hire the new instructors who had CEA
    teaching experience.

42. As a result of El-Akrich's understanding of his instructions from Moranski and
    GoldbergBelle, he had Plaintiff draft a "preliminary" teaching and course schedule for the
    Spring 2016, during December, 2015, especially, as GoldbergBelle insisted that he needed
    a schedule prior to December 30th, 2015. Normally, schedules weren't drafted until the
    beginning of January. However, based on GoldbergBelle's request, a preliminary schedule
    was submitted to El-Akrich that did not include Sue or Damery.

43. On December 23, 2015, Plaintiff was informed that Moranski had decided to give Sue and
    Damery one course each for the Spring Term. The schedule was amended and sent to El-
    Akrich for submission to Moranski and GoldbergBelle.

44. In an email shared with Plaintiff on or about December 23, 2015, Moranski stated that it
    was her decision to determine who was going to teach and that Sue and Damery were each
    to have a class. (See Plaintiff's EXHIBIT C.)

45. On February 2, 2016, Plaintiff received an email from Donna McNeely, Executive Director of University Office of Ethics and Compliance, to meet with her so she could better understand IEP.

46. On February 3, 2016, Plaintiff, at this meeting, reported the discrimination against Middle Eastern Muslim students by Sue, Damery and GoldbergBelle. At the meeting were Defendant McNeely and Traci Roth, Associate Director of Ethics and Compliance. Plaintiff also told McNeely that the complaints by Middle Eastern Muslim students had been reported to Moranski and GoldbergBelle.

47. Before, during and after this meeting, Plaintiff was never informed that the meeting concerned allegations of retaliation by her and El-Akrich against Sue and Damery. Plaintiff was not informed that she was under investigation for "retaliation."

48. At noon on February 29, 2016, Moranski and GoldbergBelle met with Plaintiff and handed her a letter stating that McNeely had found her guilty of retaliation and that she was being placed on administrative leave effective immediately. Plaintiff was told to hand in her University credit cards and keys to her office and leave the campus. She was told that she was to have no contact with anyone from the University including her supervisor.

49. Plaintiff was told that she would have a chance to refute the charges in a meeting in three days with the Director of Human Resources, Laura Alexander (Alexander), and Moranski at the Human Resources office. She was not told the nature of the supposed retaliation, when the charges had been made, nor was she told who had made the charges

50. On March 3, 2016, Plaintiff met with Defendants Alexander and Moranski. At that time, she was informed of the allegations of retaliation made by Sue, Damery and Sarah Jones because each of them had not been on the preliminary draft of the Spring 2016 schedule.

11

However, to her knowledge, only Moranski and GoldbergBelle were given the preliminary schedule by El-Akrich and the final schedule approved by Moranski had all three instructors assigned at least one class.

51. Damery and Sue also alleged that in the final schedule their hours had been reduced. Plaintiff did not have the authority to offer, change terms or sign contracts; she just drafted the schedules per instructions from El-Akrich who was told by Moranski that she was making the decision who to hire for Spring 2016. (See Plaintiff's EXHIBIT C.)

52. Plaintiff, who was not given any information about the allegations against her prior to this meeting, was unable to provide a defense to the charges of retaliation.

53. During the meeting, all of Alexander's questions dealt solely with El-Akrich and did not deal with Plaintiff or her conduct. Plaintiff informed Alexander about Middle Eastern Muslim students' complaints against Sue and Damery. However, there was no further discussion about the students' complaints during the meeting.

54. On March 18, 2015, Plaintiff received a Recommendation letter from Alexander, via an email from Moranski, stating that Alexander felt that Plaintiff had retaliated against the adjuncts. One of the options recommended was immediate termination.

55. On March 21, 2016, Plaintiff verbally reported to Deanie Brown, (Brown) Associate Chancellor, Office of Access and Equal Opportunity, about the discrimination against El-Akrich by GoldbergBelle, the discrimination against the Middle Eastern Muslim students, and the pre-textual retaliation claim brought against her for reporting the discrimination. On March 22, 2016, Plaintiff put her claims of discrimination against El-Akrich and the Middle Eastern Muslim students and the retaliation against her in writing via email to Brown.

12

56. On April 15, 2016, Plaintiff again met with Brown. At this point, Plaintiff was still on administrative leave. Plaintiff told Brown she was considering filing a complaint with the EEOC. Brown asked her not to file a formal complaint while she advocated to rectify Plaintiff's situation.

57. On April 27, 2016, Plaintiff received a letter from Moranski stating she could return to work in a limited capacity, that she was not cleared of any wrongdoing and she could not return to IEP. She was informed she could not speak to any IEP students or staff and that her contract and that it would not be renewed.

58. For the period from May 4, 2016, through August 15, 2016, Plaintiff was allowed to work in the College of Business and Management.

59. On August 2, 2016, Plaintiff was allowed into her former office to collect her personal belongings. She had been asking to go into her office for over five months. Upon entering, Plaintiff found that two bookcases, which had been filled with books and reference materials, were empty. Many other items belonging to Plaintiff were missing from her desk and file cabinet. Moranski opened the offices of other IEP teachers so that Plaintiff could look for her books. As a result of the pilfering of Plaintiff's office, she filed a police report.

## COUNT I
## RETALIATION
## VIOLATION OF TITLE VII

60. Plaintiff repeats and re-alleges all of the foregoing allegations as though they were contained herein.

61. Title VII makes it unlawful for an employer to discriminate against an employee because he or she has opposed any practice made an unlawful by Title VII, or if he or she has made

13

a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

62. Throughout her employment, Plaintiff performed her job duties in a satisfactory manner consistent with the University's reasonable expectations.

63. Plaintiff asserts that being placed on administrative leave, being removed from the IEP and having her contract shortened without her consent and without consideration was the result of retaliation against her by the Defendants as a result of her having complained about the Middle Eastern Muslim discrimination by some of the IEP instructors and perpetuated by the actions of GoldbergBelle and Moranski.

64. There is a casual connection between the protected activity and the adverse employment action.

65. The Defendants have subjected Plaintiff to the above-described less favorable terms and conditions of employment, failed to take proper steps to address Plaintiff's complaints of discrimination and terminated Plaintiff's employment because of her protected activity in violation of Title VII.

66. As a direct and proximate result of one or more of the above acts of retaliation as described above, Plaintiff has sustained damages equal to lost monetary damages, has suffered substantial embarrassment and damage to her professional reputation, emotional distress damages, conversion of personal property from her office and is entitled to compensatory damages, punitive damages, as well as attorneys' fees and costs.

## COUNT II
## LACK OF DUE PROCESS
### (Fourteenth Amendment of U.S. Constitution)

67. Plaintiff repeats and re-alleges paragraphs 1 – 59.

14

68. Defendants engaged in activities which violated Plaintiff's Constitutional rights under the Fourteenth Amendment and its corresponding State laws and the University's own Policies and Procedures.

69. Plaintiff, in direct contravention of her Due Process Rights, was not provided with notice, an explanation of the evidence against her, an opportunity to address the evidence or to be heard by an impartial decision maker.

70. Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to: loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment.  Plaintiff will continue to suffer these damages in the future.

71. Defendants' unlawful conduct was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Fourteenth Amendment; therefore, Plaintiff seeks awards of punitive damages against Defendants Moranski, GoldbergBelle, Alexander and McNealy in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT III
## CONSPIRACY UNDER SECTION 1985
## (42 U.S.C. §1985)

72. Plaintiff repeats and re-alleges paragraphs 1 – 59.

73. All Defendants and other co-conspirators, known or not yet know to Plaintiff, reached an agreement among themselves to remove Plaintiff from her position as Academic Coordinator in the IEP at the University in violation of Plaintiff's Constitutional rights as described above.

74. In furtherance of the conspiracy each of the co-conspirators committed overt acts and was a willful participant in joint activity.

75. This misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's Constitutional rights.

76. As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and she suffered substantial and irreparable harm, including loss of income and benefits, loss of professional reputation, out of pocket expenses, attorneys' fees and severe emotional distress.

## COUNT IV
## VIOLATION OF ILLINOIS STATE OFFICIALS AND EMPLOYEES ETHICS ACT
## (5 ILCS 430/15-10)

77. Plaintiff repeats and re-alleges paragraphs 1 – 59.

78. The State Officials and Employees Act prohibits retaliatory action by a State agency or employee against a State employee because he or she 1) disclosed or threatened to disclose to a supervisor or to a public body and activity, policy or practice of any State agency or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation; or 2) provides information to any public body conducting an investigation, hearing or inquiry into violation of law, rule, or regulation by any State agency or State employee.

79. Defendants University of Illinois Springfield and the Board of Trustees of the University of Illinois are State agencies within the meaning of 5 ILCS 430/15-10.

80. Defendants Karen Moranski, Johnathan GoldbergBelle, Laura Alexander, and Donna McNealy are State employees within the meaning of 5 ILCS 430/15-10.

16

81. Pursuant to 5 ILCS 430/15-5 through 15-20, the actions against Plaintiff by the Defendants were adverse employment actions in retaliation for Plaintiff's protected activity as described herein. Plaintiff reasonably believed the activities, policies and practices at the University violated the laws, rules and regulations. Plaintiff's protected activity was a contributing factor that caused such adverse actions to be taken against her.

82. Pursuant to 5 ILCS 430/15-25, Plaintiff is entitled to all remedies necessary to make her whole and prevent future violations of the Act, including, but not limited to: reinstatement to her previous position within the University, as well as reinstatement of full benefits and seniority rights, and reasonable attorneys' fees. In order to make her whole, Plaintiff also seeks an award of compensatory damages for the severe emotional distress, loss of professional reputation and humiliation she has had to incur.

83. To prevent future violations of the Act, Plaintiff seeks an award of punitive damages against the Defendants.

## COUNT V
## VIOLATION OF WHISTLEBLOWER ACT
### (740 ILCS 174/1 *et. seq.)*

84. Plaintiff repeats and re-alleges paragraphs 1 – 59.

85. As set forth in the preceding paragraphs, Plaintiff engaged in activities for which government employees are protected from retaliation by the Whistleblower Act §15 when the employee discloses information where the employee has reasonable cause to believe that the information discloses a violation of State or federal law, rule, or regulation.

86. Three weeks after meeting with McNealy, Executive Director of the University Ethics and Compliance Office and disclosing to her the discriminatory conduct of certain adjunct

instructors, and Defendants GoldbergBelle and Moranski, Plaintiff was removed from her position with IEP and placed on administrative leave.

87. Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to: loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

88. Defendants' unlawful conduct was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Whistleblower Act, and Plaintiff therefore seeks awards of punitive damages against these defendants in order to deter them and others similarly situated individuals from such wrongful conduct in the future.

## COUNT VI
## STATE LAW BREACH OF CONTRACT

89. Plaintiff repeats and re-alleges paragraphs 1 – 59.

90. As described above, Plaintiff formed a contract with Defendants University of Illinois Springfield and Board of Trustees by accepting their offer of continued employment on February 5, 2016. On February 2, 2016, Moranski spoke to Plaintiff about renewing her previous fulltime contract, that had expired, and she offered a promotion to the Visiting Academic Coordinator position. Pursuant to the terms and conditions of Plaintiff's previous fulltime employment contracts with the University it was Plaintiff's understanding that contract, as was normal and customary, would be for 12 months.

91. Defendants' contractual obligations also included an obligation of good faith and fair dealing in performance of the contract, the University's own rules and regulations including University of Illinois Statutes and under the laws of the State of Illinois.

18

92. Plaintiff substantially performed all her contractual obligations required of her under the contract up to the time of breach.

93. Defendants violated their obligation of good faith and fair dealing as to the terms and conditions of that contract.

94. Plaintiff has suffered damages as a result of this breach including loss of income, benefits and other out-of-pocket costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A.     Award damages to Plaintiff for loss of pay and benefits incurred as a result of the retaliation against her as alleged in this complaint, pursuant to and within the statutory limits under Title VII of the Civil Rights Act as well as incidental, consequential, and punitive damages;

B.     Award damages to Plaintiff for loss of pay and benefits incurred as a result of the discrimination against her as alleged in this Complaint, pursuant to and within the statutory limits under the Due Process Clause of the Fourteenth Amendment of the Constitution as well as incidental, consequential, and punitive damages;

C.     Enter a declaratory judgment that Defendants have unlawfully retaliated against Plaintiff in violation of the State Officials and Employees Ethics Act, 5 ILCS 430/15-10.

D.     Grant Plaintiff a judgment for compensatory damages as to each count in an amount sufficient to fully compensate her, and grant Plaintiff a judgment against the Defendants GoldbergBelle, Moranski, Alexander, and McNeely for punitive damages;

E.     Permanently enjoin the University from retaliating those who complain of discrimination by appointing a court monitor to prevent such wrongdoing;

F.      Assess against the University and in favor of the Plaintiff such liquidated and exemplary

damages as may be provided by law for the willful violations of the law committed by it;

G.      Award Plaintiff damages for pain and suffering;

H.      Award Plaintiff pre-judgment interest for the defined sum of wages and benefits lost;

I.      Grant Plaintiff reasonable attorneys' fees, costs, and fees for experts; and

J.      Grant Plaintiff such other relief as this Court deems necessary and proper.

        PLAINTIFF DEMANDS TRIAL BY JURY.

                                                JACQUELINE TANNER
                                                Plaintiff

                                                By Mona Ahsan

                                                S. Mona Ahsan
                                                Attorney for the Plaintiff

S. Mona Ahsan #6236610
Law Office of Mona Ahsan
2901 Wildcat Court
Springfield, Il 62711
410-507-4443
mona@ahsan-law.com

Kathryn E. Eisenhart #6183716
Attorney for Plaintiff
Eisenhart Law Office
17 Hawthorne Lane
Springfield, IL 62712
217-679-6410
eisenhartlawoffice@gmail.com

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Jacqueline Tanner**                                             From:  **Chicago District Office**
    **c/o Mona Ahsan, Esq.**                                                    **500 West Madison St**
    **Attorney at Law**                                                          **Suite 2000**
    **2901 Wildcat Court**                                                      **Chicago, IL 60661**
    **Springfield, IL 62711**

☐     *On behalf of person(s) aggrieved whose identity is*
      *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | **Daniel Lim,** | |
| **21B-2016-01205** | **State & Local Coordinator** | **(312) 869-8082** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒     More than 180 days have passed since the filing of this charge.

☐     Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒     The EEOC is terminating its processing of this charge.

☐     The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐     The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐     The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/kt*                                                 November 15, 2016

Enclosures(s)                                                            *(Date Mailed)*

**Julianne Bowman,**
**District Director**

cc:     **THE BOARD OF TRUSTEES OF THE**
        **UNIVERSITY OF ILLINOIS**
        **c/o Deanie Brown**
        **Associate Chancellor of Access & Equal Opportunity**
        **Office of the Chancellor**
        **One University Plaza, MS PAC 491**
        **Springfield, IL 62703**



| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.<br><br># 16M0428.07 | ☒ IDHR<br><br>☐ EEOC | 2016SF2452 |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | | TELEPHONE NUMBER (include area code) | | |
|---|---|---|---|---|
| Ms. Jacqueline Tanner | | 217-370-3261 | | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH | | |
| 615 Washington St. | Beardstown, Illinois 62618 | / / | | |
| | | M | D | Y |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (include area code) | |
|---|---|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS | | 217-206-6600 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |
| One University Plaza | Springfield, Illinois 62703 | | Sangamon |
| CAUSE OF DISCRIMINATION BASED ON:<br><br>RETALIATION | | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL)<br><br>02/29/2016<br>☐ CONTINUING ACTION | |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

I.   A.   ISSUE/BASIS
UNEQUAL TERMS AND CONDITIONS OF EMPLOYMENT ON FEBRUARY 29, 2016 BASED ON RETALIATION.

B.   PRIMA FACIE ALLEGATIONS
1. On 11/16/2016 and 02/03/2016, I opposed discrimination to Respondent.
2. My work performance as Visiting Clinical Instructor met Respondent's expectations.
3. On February 29, 2016, Karen Moranski, Vice Chancellor, subjected me to unequal terms and conditions of employment when I was placed on administrative leave, not allowed to teach, took away my duties, and banned me from campus as well as student contact.
4. The unequal terms and conditions of employment followed my participation in a protected activity within such a period of time as to raise an inference of retaliatory motivation.

Page 1 of 1
rys

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SUBSCRIBED AND SWORN TO BEFORE ME<br><br>THIS 11th DAY OF May 2016<br><br>X _Kaur Bice_<br>NOTARY SIGNATURE |
|---|---|
| OFFICIAL SEAL<br>KAREN J BICE<br>Notary Public - State of Illinois<br>My Commission Expires Jun 20, 2018<br><br>NOTARY STAMP | X _Jacqueline Tanner_   5/11/16<br>SIGNATURE OF COMPLAINANT   DATE<br>I declare under penalty that the fore... affirm that I have read the... the best of my knowledge, i... |

EXHIBIT
B

EEO-5 FORM (Rev. 11/09-INT)

**From:** "Elakrich, Driss" <delak2@uis.edu>
    **a:** Wednesday, December 23, 2015 at 1:29 PM
**To:** "Moranski, Karen R" <kmora1@uis.edu>
**Cc:** GoldbergBelle Jonathan <jgold1@uis.edu>
**Subject:** RE: IEP Hiring for Spring Semester

Hi Karen,

Thank you so much for the email and I am fine with giving those instructors another chance. In the meantime, is there anything else you need from me to get the new hires processed in a timely manner?
All the best,
Driss

**From:** Moranski, Karen R
**Sent:** Wednesday, December 23, 2015 11:27 AM
**To:** Elakrich, Driss <delak2@uis.edu>; GoldbergBelle, Jonathan <jgold1@uis.edu>
**Subject:** IEP Hiring for Spring Semester

Jonathan and Driss,

I have read all the emails sent by both of you in recent days. I have talked with both of you individually and together about these issues. I think we have reached the point where I need to step in and decide a course of action for the spring semester, since Linette must follow the procedures on the timetable I outlined in my email last week.

It appears to me that we have two main issues to deal with:

1. Serving our IEP students well
2. Serving the institution well

Driss, I appreciate your concerns about some of the instructors that are currently serving IEP. The informal notes from students that you collected a couple of weeks ago indicate that students have concerns about several of the instructors, both ones you want to rehire and ones you want to release from further contracts. I have seen the resumes of the new instructors, some of whom seem very well qualified and others of whom seem to have no more experience than current instructors, but may have other advantages, such as a willingness to work on co-curricular activities with the students. We want to be sure that adjunct and full-time instructors are serving students well, and we want to have an evaluation process that provides a voice for student feedback, as well as valid and reliable feedback to instructors. We are in the process of developing that form, but, as we have discussed, it will likely be fall before we can implement the new form through the Provost's Office, in the same way the Speakers Series created a form. In the meantime, I know you are using a current form to do some evaluation of instructors that is going to you for review.

I am also aware that there has been set of difficult discussions with several of the instructors in recent months over process and policies related to grading, attendance, and other matters. We have tried to address these issues through the assessment process, and I think we are making good progress in building these processes and policies. As we know from the November staff meeting, however, there is still a lot of frustration among the instructors and some frustration among the IEP staff. The relationship has not been a positive one. Instructors have expressed concern on multiple occasions about whether their contracts are dependent on their agreement with the staff, particularly the coordinator. Whether or not that accusation is urate is not really the issue at this point, because the impression is a problematic issue from an institutional perspective—that is not the reputation that UIS has in the community. We have long-standing positive relationships with adjunct faculty, many of whom have served the university for years, if not decades. Given the relative sparsity of inst experience in the Springfield, I am not sure we can afford to alienate that community.

**EXHIBIT**

C

3

I am also sensitive, however, to the need to improve the program, and to bring in adjuncts to meet IEP's needs. We want that improvement to continue, and that may mean making some changes over time to the adjuncts teaching our courses. We also t to move forward with hiring more full-time instructors, which will reduce our dependence on adjuncts.

The final factor I am taking into account are the searches we are doing in the spring and summer for the IEP Director and the other two full-time staff. Right now, all full-time staff are visiting, and that creates vulnerability for the full-time staff and for the institution. I want to protect the integrity of the program and protect full-time staff from criticisms that may undermine our ability to serve students.

Given that context, here is what I want you both to do with regard to the adjuncts for Spring 2016:

1. We will issue letters of hire for spring 2016 for all adjuncts who taught in fall 2015. I realize that is not where the program was headed, but that is what we will do for spring. Each of those instructors should be assigned at least one course. At the beginning of the spring semester, the two of you should meet together with each returning adjunct. In that meeting you should identify teaching strengths and areas of pedagogical concern. You should work out a plan with each instructor for working on the areas of concern. That meeting should be followed up with an email that reviews the discussions and the plan of action.

2. You may issue letters of hire for new adjuncts. Each of those instructors may be assigned at least one course. As per my . email of last week, you should complete all required new hire processes by January 16.

3. For all letters of hire, you may list a range of courses to be taught, based on the instructor's expertise. You do not have to specify which courses will be taught, which will give you some flexibility to determine how many sections of each course will need to be taught based on enrollment and student language skills. You must, however, per Natalie Taylor, indicate how many hours the adjunct will teach and what the stipend will be for teaching those hours. If we need to add hours to an adjunct's schedule for spring because of increased enrollment (for Spring 1 or Spring 2), then we will do that the week before classes t for each session. Underestimating hours and stipend rather than overestimating is the better decision at this point.

4. This plan may require that you spread out the necessary teaching assignments over more adjunct instructors. I would rather see more instructors with fewer hours for spring 2016, and then we can plan to run searches for full-time positions for fall 2016 to cut down on the adjuncts.

5. For spring 2016, all full-time and adjunct instructors will be subject to the IEP evaluations that currently exist. Those evaluations should be done in the same fashion as the standard UIS teaching evaluations—anonymously, with the teacher having left the room. To avoid questions about the process, I think for spring 2016, those evaluation packets should be delivered to Debra Ply in the Provost's Office, who will tally responses and give the information back to Driss and Jonathan for review. She will also send the forms back to the instructors so that they have the feedback on their instruction. Evaluations should be done each session.

I am happy to take questions about implementing the plan I have set forth, but we will go ahead and make the hires as I have described above. We will provide an opportunity for current adjuncts to demonstrate the ability to improve teaching and perhaps provide an opportunity for new instructors to gain experience with the program.

Thanks to both of you.

Best,
Karen

---

**From:** "Elakrich, Driss" <delak2@uis.edu>
**Te:** Tuesday, December 22, 2015 at 4:04 PM
  "GoldbergBelle, Jonathan" <jgold1@uis.edu>, Karen Moranski <kmora1@uis.edu>
**Subject:** RE: Memos to Hire

Hi Jonathan,

4