E-FILED
Thursday, 30 November, 2017 03:43:24 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JACQUELINE TANNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 17 C 3039 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITYOF ILLINOIS; | ) | |
| KAREN MORANSKI, | ) | |
| Associate Vice-Chancellor, in her | ) | |
| Official and Individual Capacity; and | ) | |
| JONATHAN GOLDBERGBELLE, | ) | |
| Senior Director of International | ) | |
| Programs and Internships, in his | ) | JURY   TRIAL |
| Official and Individual Capacity; | ) | DEMANDED |
| LAURA ALEXANDER, Senior Director | ) | |
| Of Human Resources, in her | ) | |
| Official and Individual Capacity; and | ) | |
| DONNA MCNEELY, Director of | ) | |
| University Ethics and Compliance | ) | |
| Office, in her Official and Individual | ) | |
| Capacity, | ) | |
| | ) | |
| Defendant(s). | ) | |

## SECOND AMENDED COMPLAINT AT LAW

Now comes, Plaintiff, Jacqueline Tanner, by and through her attorneys of record, S. Mona

Ahsan and Kathryn E. Eisenhart and for her Complaint at Law, states as follows:

## NATURE OF THE ACTION

1.      This action is brought to remedy unlawful discrimination practices under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; violations of Due Process

Clause of the U.S. Constitution and 42 U.S.C. §1983; violation of First Amendment of the U.S.

Constitution and 42 U.S.C §1983; Conspiracy under 42 U.S.C. §1985; violation of Title VI of

the Civil Rights of 1964; and violation of the Illinois Civil Rights Act.  Plaintiff seeks injunctive relief

and damages including, but not limited to: back pay and reinstatement to her prior position, other make-whole relief, compensatory damages including emotional distress against all Defendants, and punitive damages against Defendants Moranski, GoldbergBelle, Alexander and McNeely.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, and 42 U.S.C. §2000e- 5(f)(3). Supplemental jurisdiction is conferred by 28 U.S.C. §1367 for Plaintiff's state law causes of action.

3.      Venue is proper in the Springfield Division of the Central District of Illinois because the employment practices hereafter alleged to be unlawful were committed within this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.   Plaintiff has exhausted all of her administrative remedies prior to bringing this lawsuit.

5.   Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Right to Sue Letter from the EEOC on Nov 21, 2016, a true and correct copy of which is attached as Plaintiff's EXHIBIT A. The Right to Sue Letter was issued as a result of the charge of discrimination filed by the Plaintiff and received by the EEOC on May 11, 2016, a true and correct copy of which is attached as Plaintiff's EXHIBIT B. All allegations of said charges and exhibits are incorporated by reference hereto.

## PARTIES

6.   Plaintiff, Jacqueline Tanner is a Citizen of the United States who, at the time of the events in question, resides in Cass County, Illinois.

7.   Plaintiff is an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

8.   During all relevant times, Defendants, Board of Trustees of the University of Illinois, hereafter referred to as "The University" or "University", constitutes a corporation whose missions include teaching, research, and public service in many academic disciplines.

9.   The University is a covered entity within the meaning of the Civil Rights Act of 1964. The University is an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

10. At all relevant times, Defendant Karen Moranski hereafter referred to as "Moranski" was the Associate Vice-Chancellor of Undergraduate Education at the University of Illinois Springfield (UIS).

11. At all relevant times, Defendant Jonathan GoldbergBelle hereafter referred to as "GoldbergBelle" was the Senior Director of International Programs and Internships at University of Illinois Springfield (UIS).

12. At all relevant times, Defendant Laura Alexander hereafter referred to as "Alexander" was the Senior Director of Human Resources at University of Illinois Springfield (UIS).

13. At all relevant times, Defendant Donna McNeely hereafter referred to as "McNeely" was the Director of the University Ethics and Compliance Office at University of Illinois Springfield (UIS).

## STATEMENT OF FACTS

14. Plaintiff began her employment with the University of Illinois Springfield (University) as a part time Adjunct Instructor on August 16, 2011, to teach in the Intensive English Program (IEP) at the Center for Teaching and Learning (CTL). The Intensive English Program (IEP) was located within the CTL which also consisted of university wide tutoring programs. At this time, CTL was in College of Liberal Arts and Sciences (CLAS) and the Dean of CLAS, James Ermatinger (Dean) was in charge of IEP.

15. August 16, 2011, Plaintiff was first hired by Ms. Dana Atwell (Atwell), Associate Director ESL Coordinator, who remained her immediate supervisor until about June 2013, when Atwell left the program. From July 2013 through April 27, 2016, Driss El-Akrich, Interim Director of IEP (El-Akrich), was her immediate supervisor.

16. The purpose of an Intensive English Program (IEP) is to provide high quality teaching of English to speakers of other languages. That is to provide non-native speakers the language skills they need to study at an American university.

17. The courses in IEP are non-credit bearing and completion of the program doesn't guarantee admission into the University. Students need to receive a passing score on an English proficiency test to gain admission into the University. They may take the University examination, Michigan English Language Institute College English Test (MELICET), offered each semester or an acceptable test from an outside source such as, Test of English as a Foreign Language (TOEFL).

18. Therefore, the purpose of IEP is to prepare these non-native speakers to pass one of the aforementioned tests in order to be admitted into the University.

19. It was the University's policy that successful completion of the IEP curriculum did not fulfill the English proficiency requirements for international students; instead, students were required to take the aforementioned tests to enroll in the University.

20. Plaintiff is a qualified professional in second language learning with 25 years of second language learning experience. She has a degree in Foreign Language and training in English as a Second Language teaching. Additionally, she has experience teaching college level English Composition. She also has 15 years' experience teaching in IEP/ESL programs. Prior to coming to University she taught at Western Illinois University's (WIU) accredited ESL program and is familiar with the standards for IEP accreditation.

21.    From August 16, 2011, until January 16, 2014, Plaintiff was a part-time Adjunct Instructor.

22.    In January 2014, Plaintiff informed El-Akrich, who informed the Dean, that Plaintiff had been offered a full time ESL lecturer position with benefits at WIU and the she was going to leave UIS and take the WIU position.

23.    On January 16, 2014, Plaintiff was promoted to full time faculty position with benefits, given a raise, the raise was more than that which WIU had offered Plaintiff, rehired as a Visiting Clinical Instructor for a 12 month term with allowable vacations and given "special responsibilities." This was a twelve month position with vacations so that Plaintiff could work all year on her "special responsibilities." The "special responsibilities" were to develop guidelines, procedures and the core curriculum and assessments for the Commission on English Language Program (CEA) accreditation for the Intensive English Program (IEP) at UIS.

24.    Plaintiff's qualifications and expertizes in her previous accredited IEP programs where Plaintiff had worked to develop materials, curriculum and assessments per CEA guidelines

for CEA reaccreditation in accredited Intensive English Programs (IEP) were the primary reason why she was given the "special responsibilities." Moreover, Plaintiff also had extensive expertise in English Composition and Writing. Plaintiff had also successfully developed the ESL level 6 curriculum for UIS under Atwell which ended up becoming a University course for credit. Plaintiff had also successfully researched and developed methods and materials to improve second language learners' reading and writing skills at WIU and twice Plaintiff had the honor of presenting her research at the Illinois Teachers of English to Speakers of Other Languages (TESOL) conferences; (1) 2009—"Children and Young Adult Literature for the Adult ESL Learner" and (2) 2010—"Achieving Fluency through Literature."

25. TESOL is a national and an international association of professionals advancing the quality of English language teaching through professional development, research, standards, and advocacy.

26. Plaintiff's main job under the "special responsibilities" was to develop the core curriculum, methods of assessments and policies and procedures as required by the Commission on English Language Program Accreditation (CEA) for the IEP Department. It was the University's plan to obtain CEA accreditation for the IEP and to meet the same standards as the IEP/ESL Programs at the University's Chicago and Urbana campuses.

27. In January 2014, Plaintiff's immediate supervisor was Driss El-Akrich, Interim Director of IEP who reported to the Dean of CLAS.

28. In March of 2013, before Atwell left, El-Akrich was sent as University liaison to Saudi Arabian Cultural Mission (SACM) in Washington D.C., because he was a native Arabic speaker and Muslim and the fact that he understood the Arabic culture and the needs of Saudi

students, in addition, to the requirements of the University. He was sent to SACM to request that the University and the IEP department be placed on SACM's list of approved colleges. This visit was approved by the Dean.

29. SACM provides scholarships and stipends for Saudi students, but only if the students attend Universities and Programs on the list approved by SACM. Plaintiff and El-Akrich believed such approval would increase enrollment and add diversity at the University. El-Akrich obtained approval for the University and IEP from SACM the same day as his visit.

30. Based on the approval from SCAM the IEP grew from about 8 – 10 students to about 55 – 60 students per semester over the next two years.

31. The faculty members increased from 3 to 9.

32. In 2014, it was decided by the Dean with the support and approval of the Provost and Vice-Chancellor, Lynn Pardie, (Provost) that the IEP should seek CEA accreditation.

33. Based upon the growth of the IEP and the effort to obtain CEA accreditation, the Dean requested that three full-time faculty be hired. This request was approved.

34. On July 1, 2015, the IEP underwent a re-organization; and on that date it was no longer part of CLAS but was part of the Center for Academic Success (CAS) and under Defendant GoldbergBelle the Senior Director of International Programs and Internships. GoldbergBelle reported directly to Defendant Moranski, Associate Vice-Chancellor of Undergraduate Education. However, El-Akrich, as the Interim Director of IEP, remained Plaintiff's immediate supervisor.

35.    Prior to IEP being transferred to CAS, an assessment of the IEP was done by GoldbergBelle.  The Provost wanted all the departments under Center for Academic Success (CAS) assessed. IEP was scheduled to be the first assessed because it had faced rapid growth.

36.    GoldbergBelle focused his assessment interview with Plaintiff on student attendance. Plaintiff explained to GoldbergBelle that El-Akrich followed the same guidelines as had his predecessor, Atwell. When students missed classes all teachers reported these absences to El-Akrich. If there was an issue and El-Akrich was not able to contact the student, he would ask the International Student Services (ISS) for assistance. This had been the practice under Atwell.

37.    Plaintiff explained to GoldbergBelle that CEA guidelines for assessing students were based on direct evidence demonstrating how well a student met the student's learning outcomes in a given course or at a given level. Direct evidence included standardized tests, comprehensive exams, portfolios, rubrics, or scales, but did not include attendance.

38.    On or about August 3, 2015, Plaintiff reported to Moranski the discriminatory behavior by GoldbergBelle and his Program Coordinator, Barbara Sykes, against El-Akrich. This complaint dealt specifically with discriminatory actions against El-Akrich and the Mexican exchange students from the Proyecta program. The Proyecta program was a short term program for Mexican students to come to the University for a month to study English. It was a program initiated by President Obama and the Mexican government.

39.    During that meeting, Plaintiff reported that it was her opinion that GoldbergBelle was treating El-Akrich very differently than his white, female predecessor and that it was her opinion that such treatment was based upon El-Akrich's national origin, race and religion.

40.    Moranski did not investigate the complaint of discrimination.

41.   On October 21, 2015, Plaintiff reported discrimination against the Middle Eastern

Muslim/Arab students by GoldbergBelle and two IEP adjunct teachers to Ms. Lucia Vasquez,

(Vasquez) Assistant Dean of the College of Liberal Arts and Sciences:

   a.      Specifically, Plaintiff reported that GoldbergBelle was fixated on student absences

specifically those of Middle Eastern/Arab Muslim students and insisted that teachers report such

absences directly to him, not to El-Akrich, in contravention of the practices of IEP and the CEA

guidelines.

   b.      Plaintiff reported to Vasquez that GoldbergBelle made statements about a

Middle Eastern/Arab Muslim student who, because of his absences from one of the classes,

should be deported. Yet, GoldbergBelle did not have similar concerns for the two Chinese

students who did not attend classes for almost a semester.

   c.      Sue Alexander (Sue) and Rebecca Damery (Damery), adjunct faculty in IEP,

reported student absences only to GoldbergBelle. El-Akrich was uniformed of this

arrangement and thus uninformed of student absences.

   d.      GoldbergBelle treated El-Akrich very differently than his white, female,

predecessor Atwell, including keeping El-Akrich out of the information loop necessary for

him to perform his duties as Interim Director.

   e.      Plaintiff noted that there was a disparity between the grades and progression

reports received by two Middle Eastern/Arab Muslim students and a female Vietnamese student

in Sue's class. All three students had failing grades in Sue's class but Sue had promoted the

Vietnamese student up to the next level, but did not promote the Middle Eastern/Arab Muslim

students.  Plaintiff had all three students in her class and based upon their test

grades, which measured proficiency, she determined all three should move up to the next level.

      f.      Damery refused to allow a Middle Eastern/Arab Muslim student to attend her class, even though he was on her class roster. She ordered him to leave her class and to bring a note from the IEP office to verify that he was correctly placed in her class; even though, she knew that the IEP office wasn't staffed and that there would be no staff in the office.

      g.      However, on the same day, Damery allowed a female Chinese student to remain in class, even though, there was a question as to whether this student was placed at the correct class level. This Chinese student was not ordered to get a note from the IEP office to verify that she was properly placed. She attended Damery's class.

      h.      This Middle Eastern/Arab Muslim student complained to Plaintiff about Damery's treatment of removing him from her class even when he was on her roster. Plaintiff reported the complaint to El-Akrich.

42.      Moranski was angry when she became aware that Plaintiff had spoken to Vasquez in the Dean's office and told El-Akrich that Plaintiff should not have gone out of the chain of command to report the discrimination.

43.      On or about November 11, 2015, Plaintiff met with Moranski—Moranski came to Plaintiff's office—Plaintiff apologized about going out of the chain of command to Vasquez, and reported the aforementioned incidents of discrimination she had discussed with Vasquez in the Dean's office. Plaintiff specifically remembers informing Moranski that the, "Saudi students were being targeted." Plaintiff also reported that GoldbergBelle was not following established procedures as per CEA guidelines—that he was obtaining attendances and

grades of Saudi students directly from teachers and keeping El-Akrich, Interim Director, out of the information loop.

44.     On November 13, 2015, students came to Plaintiff's office to complain about treatment by certain IEP faculty including Sue and Damery. Plaintiff took notes, typed up the complaints and sent them to El-Akrich.

45.     Shortly thereafter, on or about November 24, 2015, El-Akrich reported the students' complaints of discrimination to Moranski and GoldbergBelle during a scheduled bi-weekly meeting. El-Akrich also raised concerns about the inexperience of the present IEP faculty in previously teaching in CEA accredited programs, their inability to comprehend the "proficiency" standard regarding the promotion of students in IEP per CEA and student complaints. El-Akrich suggested hiring faculty with prior teaching experience in a CEA accredited programs would better serve the program. Both GoldbergBelle and Moranski agreed to hire new instructors, who had prior experience in teaching ESL in a CEA accredited program, for the upcoming term.

46.     In December 2015, as a result of El-Akrich's understanding of his instructions from Moranski and GoldbergBelle, he had Plaintiff draft a "preliminary" teaching and course schedule for Spring 2016. This was done especially on GoldbergBelle's insistence that he needed a schedule prior to December 30, 2015. Normally, schedules weren't drafted until the beginning of January when enrollment is known. However, as per GoldbergBelle's insistence, Plaintiff submitted a preliminary schedule to El-Akrich in December 2015. As directed that schedule did not include Sue or Damery.

47.     On December 23, 2015, Plaintiff was informed that Moranski had decided to give Sue and Damery one course each for the Spring Term and that each should be added to the schedule.

Plaintiff amended the schedule, as requested, and sent it to El-Akrich for submission to Moranski and GoldbergBelle.

48.  In an email shared with Plaintiff on or about December 23, 2015, Moranski stated that it was her decision to determine who was going to teach and that Sue and Damery were each to have a class.  (See Plaintiff's EXHIBIT C.)

49.  On February 2, 2016, Plaintiff was told by Moranski that Plaintiff was being promoted to the position of "Visiting Academic Coordinator" that it was a position especially created for Plaintiff—it hadn't existed before. Plaintiff understood this visiting position was similar to her prior position of "visiting clinical instructor" could be held only for three years as per University's rules and/or statutes. She had been informed that one can only stay in that visiting status for three years until there is a formal search for that title. However, the University could retain that person with the visiting status provided they gave him/her a different title/position.

50.  On February 2, 2016, Plaintiff received an email request from Donna McNeely, Executive Director of University Office of Ethics and Compliance, to meet with her so she could better understand IEP. (See Plaintiff's Exhibit D)

51.  On February 3, 2016, Plaintiff, met with McNeely and reported the discrimination against Middle Eastern/Arab Muslim students by Sue, Damery and GoldbergBelle. At the meeting were Defendant McNeely and Traci Roth, Associate Director of Ethics and Compliance. Plaintiff also told McNeely that the complaints by Middle Eastern/Arab Muslim students had been previously reported to Moranski and GoldbergBelle.

52.   Plaintiff also informed McNeely about the discrimination against El-Akrich by GoldbergBelle and his staff. Plaintiff informed McNeely that she had gone to Vasquez in the

Dean's office and also reported the aforementioned discrimination. And that she had also inform Moranski about the discrimination.

53.    Before, during and after this meeting until she met Alexander on March 3, 2016, Plaintiff was never informed that the meeting with McNeely in Ethics and Compliance concerned allegations of retaliation, against her and El-Akrich, by Sue and Damery.

54.    Before, during and after this meeting, Plaintiff was not informed that she was under investigation for any "retaliation" by any of the Defendants until she was put on administrative leave.

55.    On February 5, 2016, a Friday, Plaintiff was informed in the afternoon that her contract was ready. Linette Hughes, Business Administrative Associate for the Center for Academic Success, contacted Plaintiff and threatened her to sign or lose her benefits—Plaintiff was told that she should sign and fax the contract that same day or lose all of her benefits.

56.    This contract was shortened from a normal and customary twelve month term to a seven month term—from January 16, 2016 until August 15, 2016. It also did not include a raise in salary; despite the fact, Plaintiff was promoted to an Academic Coordinator and given more responsibilities.

57.    At noon on February 29, 2016, Moranski and GoldbergBelle met with Plaintiff and handed her a letter stating that McNeely had found her guilty of retaliation and that she was being placed on administrative leave effective immediately. Plaintiff was told to hand in her University credit cards and keys to her office and leave the campus. She was told that she was to have no contact with anyone from the University including her supervisor. (See Plaintiff's Exhibit E)

58.    Plaintiff was told that she would have a chance to refute the charges in a meeting, in three

days, with the Director of Human Resources, Laura Alexander (Alexander), and Moranski at the

Human Resources office. However, Plaintiff was not provided any information regarding the

nature of the supposed retaliation; who had filed the charges, what was the nature of

theses retaliation charges, when were they filed and why hadn't she been informed about these

allegations earlier?

59.    Plaintiff wasn't given a meaningful opportunity to prepare her response.

60.    On March 3, 2016, Plaintiff met with Defendants Alexander and Moranski. At that time,

she was informed of the allegations of retaliation made by Sue, Damery and Sarah Jones – they

claimed retaliation because each of them had not been on the preliminary draft of the Spring

2016 schedule that Plaintiff had drafted as directed. They also claimed retaliation because in the

final schedule their hours were reduced.To Plaintiff's knowledge, only Moranski, GoldbergBelle

and El-Akrich were privy to the preliminary schedule—it wasn't supposed to be shared with the

staff until its final approval by GoldbergBelle and Moranski. The final schedule, approved by

Moranski, had all three instructors assigned at least one class per Moranski's decision.

61.    Plaintiff did not have the authority to offer, change terms or sign contracts; she just

drafted the schedules per instructions from El-Akrich who was directed by Moranski, the final

decision maker, who to hire for Spring 2016. (See Plaintiff's EXHIBIT C.)

62.    As Plaintiff was not given any information i.e., meaningful notice about the

allegations against her prior to this meeting, she was unable to provide an effective defense.

During the meeting, all of Alexander's questions to Plaintiff were solely concerned with El-

Akrich and what he had said and done. Most of the questions did not pertain to Plaintiff or

her conduct. Plaintiff informed Alexander about Middle Eastern/Arab Muslim students'
complaints against Sue and Damery.

64.     On March 18, 2015, Plaintiff received a Recommendation letter from Alexander, via an
email from Moranski. Alexander determined that Plaintiff had retaliated against the adjuncts Sue
and Damery. One of the options recommended was immediate termination.

65.     On March 21, 2016, Plaintiff verbally reported to Deanie Brown, (Brown) Associate
Chancellor, Office of Access and Equal Opportunity, about the discrimination against El-
Akrich by GoldbergBelle, the discrimination against the Middle Eastern/Arab Muslim
students, and the pre-textual retaliation claim brought against her for reporting the
discrimination.

66.     On March 22, 2016, Plaintiff put her claims of discrimination against El-Akrich and the
Middle Eastern/Arab Muslim students and the retaliation against her in writing via an email to
Brown.

67.     On April 15, 2016, Plaintiff again met with Brown. At this point, Plaintiff was still on
administrative leave. Plaintiff told Brown she was considering filing a complaint with the
EEOC.  Brown asked her not to file a formal complaint while she advocated to remedy
Plaintiff's situation.

68.     On April 27, 2016, Plaintiff received a letter from Moranski stating she could return to
work in a limited capacity until the end of her contract, however, she was not cleared of any
wrongdoing and she could not return to IEP. She was informed she could not speak to any IEP
students, faculty or staff and that her contract would not be renewed.

69.     For the period from May 4, 2016, through August 15, 2016, Plaintiff was directed/allowed to work in the College of Business and Management from home.

70.     On August 2, 2016, Plaintiff was finally allowed into her former office to collect her personal belongings. She had been requesting Moranski to enter her office to retrieve her personal belongings for over five months. Upon entering, Plaintiff found that two bookcases, which had been filled with her books and reference materials, were empty. Many other items belonging to Plaintiff were missing from her desk and file cabinet. Moranski opened the offices of other IEP teachers so that Plaintiff could look for her books. Plaintiff filed a police report regarding the theft of her personal property.

71.     Plaintiff has been told that there are rumors in the IEP Department that Plaintiff and El-Akrich were dismissed because of their illegal dealings with the "Gary" Yuesong Yang. Yang had been hired by the University to recruit Chinese students as a "Student Advisor" in 2013. He would bring students to IEP department.

72.     The wrongful Ethics violation on Plaintiff's record creates a black mark against her professionally and has caused significant reputational harm to Plaintiff's career and professional reputation. Major university job applications usually inquire whether the applicant has ever been a subject of an ethics violation. This has caused Plaintiff to lose tangible employment opportunities.

73.     When the position of Director of IEP was advertised Plaintiff wasn't allowed to apply for the position, contact anyone at UIS nor come on campus without Moranski's approval even though Plaintiff was fully qualified for the position and would have liked to apply. The new position was posted within a few days after Plaintiff received Alexander's recommendation

of "immediate termination" on March 18, 2016, and it was closed while Plaintiff awaited Moranski's final determination received on April 27, 2016.

74.     Plaintiff applied for two full time jobs at the CBM department at UIS; even though she was qualified she was not considered.

75.   Since August 15, 2016, Plaintiff has been unable to obtain an academic faculty position at UIS or at the numerous other universities where Plaintiff has applied such as: Southern Illinois University, McMurray, Illinois State, Lincoln Land Community College, St. Louis University, Culver Stockton, Bradley University, St Charles Community College, Capital University in Ohio, numerous colleges/universities in Pennsylvania area and University of Tampa, Florida.

76.     Plaintiff has been informed not to contact any of her previous colleagues at UIS—even for references. As a direct result of Defendants' actions Plaintiff has faced significant reputational harm and problems listing references on prospective job applications.

77.     Plaintiff was a full time visiting academic coordinator and then, per Moranski's direction, Plaintiff worked in CBM, until the expiration of her contract, correcting exams. Later, she worked as an adjunct part time ESL writing assistant in the College of Business and Management (CBM) at UIS for one semester. This is seen as a demotion by prospective employers and has significantly harmed Plaintiff's professional reputation and her career prospects.

78.     After Plaintiff had worked in Fall of 2016 for the CBM, she was told she had done a good job and was offered a part time position for January 2017.  After Plaintiff requested her personnel file from UIS, this offer was rescinded.

79. Plaintiff remains without a permanent job and without health insurance and benefits. She is unable to procure a full time academic position in her field in the United States and has been forced to, leave her husband and grandchildren who depend on her, and go overseas to teach ESL for a short term assignment. She had suffered emotional distress and loss of professional reputation due to Defendants' actions.

## COUNT I
## RETALIATION VIOLATION OF TITLE VII

80.    Plaintiff repeats and re-alleges all of the foregoing allegations 1-79 as though they were contained herein.

81.    Title VII makes it unlawful for an employer to discriminate against an employee because he or she has opposed any practice made unlawful by Title VII, or if he or she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

82.    Throughout her employment, Plaintiff performed her job duties in a satisfactory manner consistent with the University's reasonable expectations.

Plaintiff asserts that being placed on administrative leave, being removed from the IEP and having her contract term shortened, without her consent and without consideration, was the result of retaliation against her by the Defendants because she complained about the Middle Eastern/Arab Muslim discrimination by some of the IEP instructors and perpetuated by the actions of GoldbergBelle and Moranski.

84.    There is a casual connection between the protected activity and the adverse employment action.

85.    The Defendant has subjected Plaintiff to the above-described less favorable terms and

conditions of employment, failed to take proper steps to address Plaintiff's complaints of discrimination; instead, placed her on administrative leave and then removed her to College of Business until the termination of her contract because of Plaintiff's protected activity in violation of Title VII.

86.     As a direct and proximate result of one or more of the above acts of retaliation as described above, Plaintiff has sustained damages equal to lost monetary damages, has suffered substantial embarrassment and damage to her professional reputation, emotional distress damages, conversion of personal property from her office and is entitled to compensatory damages, as well as attorneys' fees and costs.

## COUNT II
### DENIAL OF PROCEDURAL DUE PROCESS
### (Fourteenth Amendment of U.S. Constitution and 42 U.S.C. § 1983)

87.     Plaintiff repeats and re-alleges paragraphs 1 – 79.

88.     This Count is brought pursuant to the Fifth and Fourteenth Amendment to the United States Constitution as well as 42 U.S.C. § 1983 against Defendants; Moranski, GoldbergBelle, Alexander and McNeely in their individual capacity.

89.     By the virtue of the parties' contractual agreement, Plaintiff's reliance on University's promises, University's representations and actions to hire her to obtain CEA accreditation for the IEP Department; Plaintiff possessed a property interest in her continued employment at the University.  (See Plaintiff's Exhibit F)

90.     Defendants deprived Plaintiff of this property interest in her continued employment as the Visiting Academic Coordinator by putting her on involuntary administrative leave, initially recommending immediate termination of employment, reducing her contract term to seven months and not renewing her contract because Plaintiff complained about racial, national origin and religious discrimination at the University against Middle Eastern/Arab Muslims students and faculty in the IEP department.

91.     Defendants deprived Plaintiff of her Liberty interest by publicly and abruptly placing Plaintiff on administrative leave, banning her from campus, banning Plaintiff from all facilities, and contact with faculty, staff and students of the IEP Department. Defendants did not allow Plaintiff to turn in her students' grades or attendance records. Defendants did not allow Plaintiff to enter her office to retrieve her personal belongings for five months after she was first abruptly placed on administrative leave. This resulted in theft of her personal property. There were rumors at the University about Gary Young's illegal activities and the spurious involvement of El-Akrich in the same illegal activities. These rumors implicate Plaintiff because she worked under El-Akrich and had also suffered an adverse action by being placed on administrative leave.

92.     Defendants engaged in activities which violated Plaintiff's constitutional rights under the Fourteenth Amendment and its corresponding State laws and the University's own Policies and Procedures.

93.     Plaintiff, in direct contravention of her Procedural Due Process Rights under the Fifth and Fourteenth Amendment of the US Constitution, and 42 U.S.C. §1983, was not provided with notice of the charges against her, an explanation of the evidence against her, an opportunity to address the evidence or to be heard by an impartial decision maker.

94.    Defendants' wrongful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to: loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, humiliation and embarrassment.  Plaintiff will continue to suffer these damages in the future.

95.    Defendants' conduct was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Fifth and Fourteenth Amendment; therefore, Plaintiff seeks awards of punitive damages against Defendants Moranski, GoldbergBelle, Alexander and McNealy in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT III
## FIRST AMENDMENT
### (First Amendment of U.S. Constitution and 42 U.S.C. § 1983)

96.    Plaintiff repeats and re-alleges paragraphs 1 – 79.

97.    This Count is brought pursuant to the Fifth and Fourteenth Amendment to the United States Constitution as well as 42 U.S.C. § 1983 against Defendants; Moranski, GoldbergBelle, Alexander and McNeely in their individual capacity.

98.    Plaintiff made complains about discrimination against Middle Eastern/Arab Muslim students and concerns of discrimination against El-Akrich, a Moroccan/Arab Muslim, by actions perpetuated by Defendants. Plaintiff was exercising her right to free speech as guaranteed by the First Amendment of the U.S. Constitution. Her complaints never impeded her duties at the University; instead, they raised awareness of issues of public concern.

99.    Plaintiff's complaints of public concerns were distorted and misconstrued by Defendants.Plaintiff's protected speech was the motivational factor for Defendants' retaliation against her. In retaliation to Plaintiff's repeated complaints regarding racial, national origin and religious

discrimination by Defendants, Plaintiff was: put on administrative leave, banned from her office, told to turn in all her keys, and banned from all contact with faculty, staff and students. Plaintiff was banned from entering University premises unless approved by Moranski. Initially, Alexander recommended "immediate termination." Later, Moranski changed it to allow Plaintiff, still barred from campus, staff, faculty and students, to work from home until her contract expired.

100.    The University's retaliatory actions in response to Plaintiff's protected speech have a chilling effect that acts as a deterrent to free speech.

101.    The nonrenewal of Plaintiff's contract by the University directly resulted in substantial and irreparable harm to Plaintiff including loss of income and benefits, out-of-pocket expenses, loss of future earnings, loss of professional reputation and emotional distress.

## COUNT IV
## CONSPIRACY UNDER SECTION 1985
## (42 U.S.C. §1985)

102.    Plaintiff repeats and re-alleges paragraphs 1 – 79.

103.    This Count is brought pursuant to the Fifth and Fourteenth Amendment to the United States Constitution as well as 42 U.S.C. § 1985 against Defendants; Moranski, GoldbergBelle, Alexander and McNeely in their individual capacity.

104.    Defendants Moranski, GoldbergBelle, Alexander and McNeely and other co-conspirators, known or not yet known to Plaintiff, reached an agreement among themselves to remove Plaintiff from her position, on or about November 11, 2015, as Visiting Academic Coordinator in the IEP at the University in violation of Plaintiff's constitutional rights as described above.

105.    In furtherance of the conspiracy each of the co-conspirators committed overt acts and was a willful participant in joint activity.

106.    This misconduct was objectively unreasonable and was undertaken intentionally

with willful indifference to Plaintiff's constitutional rights.

107.    As a direct and proximate result of the illicit agreement referenced above, Plaintiff's

rights were violated and she suffered substantial and irreparable harm, including loss of

income and benefits, loss of professional reputation, out of pocket expenses, attorneys' fees,

costs and severe emotional distress.

## COUNT V
## Title VI Retaliation

108.    Plaintiff repeats and re-alleges paragraphs 1 – 79.

109.    Title VI  of the Civil Rights Act of 1964, prohibits race and national origin

discrimination in federally assisted programs makes it unlawful for an employer to discriminate

against an employee because he or she has opposed any practice made unlawful by Title VI.

The regulation prohibits retaliation for the purpose of interfering with any right or

privilege secured by section 601 of the Act.

110.    Plaintiff made complains about discrimination against Middle Eastern/Arab Muslim

students and concerns of discrimination against El-Akrich, a Moroccan/Arab Muslim, by

actions perpetuated by Defendants. Plaintiff was exercising her right to free speech as

guaranteed by the First Amendment of the U.S. Constitution. Her complaints never impeded her

duties at the University; instead, they raised awareness of issues of public concern.

111.    Plaintiff's complaints of public concerns were distorted and misconstrued by

Defendants.  Plaintiff's protected speech was the motivational factor for Defendants' retaliation against

her. In retaliation to Plaintiff's repeated complaints regarding racial, national origin and religious

discrimination by Defendants, Plaintiff was: put on administrative leave, banned from her office, told to

turn in all her keys, and banned from all contact with faculty, staff and students. Plaintiff was banned

from entering University premises unless approved by Moranski. Initially, Alexander recommended

"immediate termination." Later, Moranski changed it to allow Plaintiff, still barred from campus, staff, faculty and students, to work from home until her contract expired.

112.    The University's retaliatory actions in response to Plaintiff's protected speech have a chilling effect that acts as a deterrent to free speech.

113.    The nonrenewal of Plaintiff's contract by the University directly resulted in substantial and irreparable harm to Plaintiff including loss of income and benefits, out-of-pocket expenses, loss of future earnings, loss of professional reputation and emotional distress.

**COUNT VI**
**Retaliation under Illinois Civil Rights Act (ICRA) 740 ILCS 23/5(a)**

114.    Plaintiff repeats and re-alleges paragraphs 1 – 79.

115.    ICRA provides, in relevant part, that no unit of local government shall "exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender." 740 ILCS 23/5(a).

116.    Plaintiff made complains about discrimination against Middle Eastern/Arab Muslim students and concerns of discrimination against El-Akrich, a Moroccan/Arab Muslim, by actions perpetuated by Defendants. Plaintiff was exercising her right to free speech as guaranteed by the First Amendment of the U.S. Constitution. Her complaints never impeded her duties at the University; instead, they raised awareness of issues of public concern.

117.    Plaintiff's complaints of public concerns were distorted and misconstrued by Defendants.  Plaintiff's protected speech was the motivational factor for Defendants' retaliation against her. In retaliation to Plaintiff's repeated complaints regarding racial, national origin and religious discrimination by Defendants, Plaintiff was: put on administrative leave, banned from her office, told to turn in all her keys, and banned from all contact with faculty, staff and students. Plaintiff was banned from entering University premises unless approved by Moranski. Initially, Alexander recommended

"immediate termination." Later, Moranski changed it to allow Plaintiff, still barred from campus, staff, faculty and students, to work from home until her contract expired.

118.    The University's retaliatory actions in response to Plaintiff's protected speech have a chilling effect that acts as a deterrent to free speech.

119.    The nonrenewal of Plaintiff's contract by the University directly resulted in substantial and irreparable harm to Plaintiff including loss of income and benefits, out-of-pocket expenses, loss of future earnings, loss of professional reputation and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Award damages to Plaintiff for loss of pay and benefits incurred as a result of the retaliation against her as alleged in this complaint, pursuant to and within the statutory limits under Title VII of the Civil Rights Act as well as incidental, consequential, and punitive damages;

B.    Award damages to Plaintiff for loss of pay and benefits incurred as a result of the discrimination against her as alleged in this Complaint, pursuant to and within the statutory limits under the Due Process Clause of the Fourteenth Amendment of the Constitution as well as incidental, consequential, and punitive damages;

C.    Enter a declaratory judgment that Defendants have unlawfully retaliated against Plaintiff in violation of the State Officials and Employees Ethics Act, 5 ILCS 430/15-10.

D.    Grant Plaintiff a judgment for compensatory damages as to each count in an amount sufficient to fully compensate her, and grant Plaintiff a judgment against the Defendants GoldbergBelle, Moranski, Alexander, and McNeely for punitive damages;

E.    Permanently enjoin the University from retaliating against those who

complain of discrimination by appointing a court monitor to prevent such

wrongdoing;

F.    Assess against the University and in favor of the Plaintiff such liquidated and exemplary

damages as may be provided by law for the willful violations of the law committed by it;

G.    Award Plaintiff damages for pain and suffering;

H.    Award Plaintiff pre-judgment interest for the defined sum of wages and benefits lost;

I.    Grant Plaintiff reasonable attorneys' fees, costs, and fees for experts; and

J.    Grant Plaintiff such other relief as this Court deems necessary and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

JACQUELINE TANNER
Plaintiff

By s/S.Mona Ahsan
S.  Mona  Ahsan
Attorney for the Plaintiff
S. Mona Ahsan # 6236610
Law Office of Mona Ahsan
2901 Wildcat Court
Springfield, Il 62711
410-507-4443
mona@ahsan-law.com

s/Kathryn E. Eisenhart
Kathryn E. Eisenhart
Attorney for Plaintiff
Kathryn E. Eisenhart #6183716
Eisenhart Law Office
17 Hawthorne Lane
Springfield, IL 62712
217-679-6410
eisenhartlawoffice@gmail.com

E-FILED
Thursday, 30 November, 2017  03:43:17 PM
Clerk, U.S. District Court, ILCD

EXHIBIT

A

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

# 16M0428.07

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ IDHR | 2016SF2452 |
| ☐ EEOC | |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | | TELEPHONE NUMBER (include area code |
|---|---|---|
| Ms. Jacqueline Tanner | | 217-370-3261 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH | | |
|---|---|---|---|---|
| 615 Washington St. | Beardstown, Illinois 62618 | / | / | |
| | | M | D | Y |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (include area code |
|---|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS | | 217-206-6600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| One University Plaza | Springfield, Illinois 62703 | Sangamon |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| RETALIATION | 02/29/2016 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

I.    A.    **ISSUE/BASIS**
UNEQUAL TERMS AND CONDITIONS OF EMPLOYMENT ON FEBRUARY 29, 2016 BASED ON RETALIATION.

B.    **PRIMA FACIE ALLEGATIONS**
1. On 11/16/2016 and 02/03/2016, I opposed discrimination to Respondent.
2. My work performance as Visiting Clinical Instructor met Respondent's expectations.
3. On February 29, 2016, Karen Moranski, Vice Chancellor, subjected me to unequal terms and conditions of employment when I was placed on administrative leave, not allowed to teach, took away my duties, and banned me from campus as well as student contact.
4. The unequal terms and conditions of employment followed my participation in a protected activity within such a period of time as to raise an inference of retaliatory motivation.

Page 1 of 1
rys

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SUBSCRIBED AND SWORN TO BEFORE ME THIS 11th DAY OF May, 201 X _[signature]_ NOTARY SIGNATURE |
|---|---|
| **OFFICIAL SEAL** KAREN J BICE Notary Public - State of Illinois My Commission Expires Jun 20, 2018 NOTARY STAMP | X _[signature]_  5/11/16 SIGNATURE OF COMPLAINANT    DATE I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |

EEO-5 FORM (Rev. 11/09-INT)

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Jacqueline Tanner**<br>c/o Mona Ahsan, Esq.<br>Attorney at Law<br>2901 Wildcat Court<br>Springfield, IL 62711 | From: **Chicago District Office**<br>500 West Madison St<br>Suite 2000<br>Chicago, IL 60661 |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **21B-2016-01205** | **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 869-8082** |

*(See also the additional information enclosed with this form.*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed un 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brough in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for **any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/ht*

**Julianne Bowman,**
**District Director**

November 15, 2016
*(Date Mailed)*

Enclosures(s)

cc: **THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS**
c/o Deanie Brown
**Associate Chancellor of Access & Equal Opportunity
Office of the Chancellor
One University Plaza, MS PAC 491**
Springfield, IL 62703

EXHIBIT

B

EXHIBIT
___C___

**From:** "Elakrich, Driss" <delak2@uis.edu>
    **a:** Wednesday, December 23, 2015 at 1:29 PM
**To:** "Moranski, Karen R" <kmora1@uis.edu>
**Cc:** GoldbergBelle Jonathan <jgold1@uis.edu>
**Subject:** RE: IEP Hiring for Spring Semester

Hi Karen,
Thank you so much for the email and I am fine with giving those instructors another
chance. In the meantime, is there anything else you need from me to get the new hires
processed in a timely manner?
All the best,
Driss

**From:** Moranski, Karen R
**Sent:** Wednesday, December 23, 2015 11:27 AM
**To:** Elakrich, Driss <delak2@uis.edu>; GoldbergBelle, Jonathan <jgold1@uis.edu>
**Subject:** IEP Hiring for Spring Semester

Jonathan and Driss,

I have read all the emails sent by both of you in recent days. I have talked with both of you individually and together about
these issues. I think we have reached the point where I need to step in and decide a course of action for the spring semester,
since Linette must follow the procedures on the timetable I outlined in my email last week.

It appears to me that we have two main issues to deal with:

1. Serving our IEP students well
2. Serving the institution well

Driss, I appreciate your concerns about some of the instructors that are currently serving IEP. The informal notes from
students that you collected a couple of weeks ago indicate that students have concerns about several of the instructors, both
ones you want to rehire and ones you want to release from further contracts. I have seen the resumes of the new instructors,
some of whom seem very well qualified and others of whom seem to have no more experience than current instructors, but
may have other advantages, such as a willingness to work on co-curricular activities with the students. We want to be sure
that adjunct and full-time instructors are serving students well, and we want to have an evaluation process that provides a
voice for student feedback, as well as valid and reliable feedback to instructors. We are in the process of developing that form
but, as we have discussed, it will likely be fall before we can implement the new form through the Provost's Office, in the
same way the Speakers Series created a form. In the meantime, I know you are using a current form to do some evaluation of
instructors that is going to you for review.

I am also aware that there has been set of difficult discussions with several of the instructors in recent months over process
and policies related to grading, attendance, and other matters. We have tried to address these issues through the assessment
process, and I think we are making good progress in building these processes and policies. As we know from the November
staff meeting, however, there is still a lot of frustration among the instructors and some frustration among the IEP staff. The
relationship has not been a positive one. Instructors have expressed concern on multiple occasions about whether their
contracts are dependent on their agreement with the staff, particularly the coordinator. Whether or not that accusation is
     urate is not really the issue at this point, because the impression is a problematic issue from an institutional perspective—
  that is not the reputation that UIS has in the community. We have long-standing positive relationships with adjunct faculty,
many of whom have served the university for years, if not decades. Given the relative sparsity of instructors with TESOL
experience in the Springfield, I am not sure we can afford to alienate that community.

3

I am also sensitive, however, to the need to improve the program, and to bring in adjuncts to meet IEP's needs. We want that improvement to continue, and that may mean making some changes over time to the adjuncts teaching our courses. We also t to move forward with hiring more full-time instructors, which will reduce our dependence on adjuncts.

The final factor I am taking into account are the searches we are doing in the spring and summer for the IEP Director and the other two full-time staff. Right now, all full-time staff are visiting, and that creates vulnerability for the full-time staff and for the institution. I want to protect the integrity of the program and protect full-time staff from criticisms that may undermine our ability to serve students.

Given that context, here is what I want you both to do with regard to the adjuncts for Spring 2016:

1. We will issue letters of hire for spring 2016 for all adjuncts who taught in fall 2015. I realize that is not where the program was headed, but that is what we will do for spring. Each of those instructors should be assigned at least one course. At the beginning of the spring semester, the two of you should meet together with each returning adjunct. In that meeting you should identify teaching strengths and areas of pedagogical concern. You should work out a plan with each instructor for working on the areas of concern. That meeting should be followed up with an email that reviews the discussions and the plan of action.

2. You may issue letters of hire for new adjuncts. Each of those instructors may be assigned at least one course. As per my email of last week, you should complete all required new hire processes by January 16.

3. For all letters of hire, you may list a range of courses to be taught, based on the instructor's expertise. You do not have to specify which courses will be taught, which will give you some flexibility to determine how many sections of each course will need to be taught based on enrollment and student language skills. You must, however, per Natalie Taylor, indicate how many hours the adjunct will teach and what the stipend will be for teaching those hours. If we need to add hours to an adjunct's schedule for spring because of increased enrollment (for Spring 1 or Spring 2), then we will do that the week before classes t for each session. Underestimating hours and stipend rather than overestimating is the better decision at this point.

4. This plan may require that you spread out the necessary teaching assignments over more adjunct instructors. I would rather see more instructors with fewer hours for spring 2016, and then we can plan to run searches for full-time positions for fall 2016 to cut down on the adjuncts.

5. For spring 2016, all full-time and adjunct instructors will be subject to the IEP evaluations that currently exist. Those evaluations should be done in the same fashion as the standard UIS teaching evaluations—anonymously, with the teacher having left the room. To avoid questions about the process, I think for spring 2016, those evaluation packets should be delivered to Debra Ply in the Provost's Office, who will tally responses and give the information back to Driss and Jonathan for review. She will also send the forms back to the instructors so that they have the feedback on their instruction. Evaluations should be done each session.

I am happy to take questions about implementing the plan I have set forth, but we will go ahead and make the hires as I have described above. We will provide an opportunity for current adjuncts to demonstrate the ability to improve teaching and perhaps provide an opportunity for new instructors to gain experience with the program.

Thanks to both of you.

Best,
Karen

**From:** "Elakrich, Driss" <delak2@uis.edu>
**'e:** Tuesday, December 22, 2015 at 4:04 PM
"GoldbergBelle, Jonathan" <jgold1@uis.edu>, Karen Moranski <kmora1@uis.edu>
**Subject:** RE: Memos to Hire

Hi Jonathan,

# RE: Request for meeting

### Tanner, Jacqueline W

Wed 2/3/2016 9:37 AM

To: Ethics Officer <ethicsofficer@uis.edu>;

Ethics Officer,

I can meet today at 1:30 pm.  Please confirm that this time is still available.

Jackie Tanner

*Jacqueline Tanner, M.A*
Visiting Clinical Instructor
*Intensive English Program*
University of Illinois Springfield

**From:** Ethics Officer
**Sent:** Tuesday, February 02, 2016 4:59 PM
**To:** Tanner, Jacqueline W
**Subject:** Request for meeting

Instructor Tanner,

The University Ethics and Compliance Office is currently conducting a review of a complaint related to the Intensive English Program. To better understand the program and employees, we are requesting an opportunity speak with you as soon as possible.  We have time available beginning at 1:30 tomorrow (Wed.) in our office (Human Resources Building, Room 20).  Please either respond to this message with a suggested time or call our office at 6-6202 to schedule a mutually convenient meeting time.

Donna McNeely
MBA, CPA, CCEP, CIA, CIG, CFSA, CGAP
Executive Director of University Ethics and Compliance
University Ethics Officer
217-206-6202

**EXHIBIT**

**D**

<< OLE Object: Picture (Device Independent Bitmap) >>

UNIVERSITY OF ILLINOIS
AT SPRINGFIELD

Office of Undergraduate Education
Office of the Provost and Vice Chancellor
Public Affairs Center, Room 519
One University Plaza, MS PAC 525
Springfield, Illinois 62703-5407

February 29, 2016

Jacqueline Tanner
615 Washington St.
Beardstown, IL 62618-1559

RE: Meeting Notice

Dear Jackie,

The campus has been notified by the University Ethics and Compliance Office (ECO) that you have engaged in conduct which, if true, would constitute retaliation in violation of University policies and state law. https://www.obfs.uillinois.edu/bfpp/non-obfs_policies/reporting-fraud-misconduct-whistleblower

This letter is to notify you that you are the subject of an inquiry into this matter to determine if your conduct was compatible with your obligation to maintain and strengthen the public's trust and confidence in the integrity of the University and its employees as contemplated in the University Code of Conduct.

These are very serious concerns that may result in adverse employment action up to and including dismissal. So that an informed decision can be made, a meeting will be held on **Thursday, March 3 at 4:00pm in the Human Resources Conference Room (HRB 33).** During this meeting, you will be given an opportunity to respond to the concerns. If you want, you may also submit written material to respond to these concerns. If you intend to have an attorney present at the meeting, please notify Laura Alexander by **5:00pm on Wednesday, March 2**. Although you may bring an attorney to the meeting, you will be the only one who is allowed to participate in the meeting. A recommendation will be prepared after the meeting and provided to me for a decision. I will communicate my decision to you in writing.

Effective immediately and until further notice, you are being placed on administrative leave with pay pending the outcome of the inquiry. You are not to contact any University of Illinois employees, students, donors, partners or friends of the University about this matter or any other official University business. You must immediately return any and all P-cards, T-cards and University-issued keys, including duplicates, to me. Keys may also be returned directly to the Police Department today. Lastly, your access to University systems, including Banner, TEM, Box, i-Buy and HireTouch has been suspended for the duration of the leave period; your University email account will remain active. All emails regarding



EXHIBIT

E

Phone  (217) 206-7413                    Fax (217) 206-7623

uisuge@uis.edu

University business should be forwarded to Jonathan GoldbergBelle to allow for timely responses and continued business activity.  Because you will continue to be in pay status, you must devote your full efforts to help bring this matter to closure and should be available to respond to inquiries and appear as necessary during normal work hours.

If you have any questions or desire additional information, please contact Laura Alexander in Human Resources at lalx5@uis.edu. She can also be reached at 217-206-7148.

If you wish to resign your position in lieu of participation in this process, please submit your resignation in writing to me by **5:00pm on Wednesday, March 2**. An email will be acceptable.

Sincerely,

Karen Moranski
Associate Vice Chancellor for Undergraduate Education

Copies: L. Alexander, Senior Director of Human Resources

## TANNER CHIROPRACTIC
Ernest P. Tanner, D.C.
215 E. 2nd St.
Beardstown IL 62618
Phone: (217) 323-3116
Fax: (217) 323-3711

# FAX TRANSMITTAL

**To:** _U I S_                                    **Date:** _2/5/16_

**ATTN:** _Linette Hughes_

**Fax#:** _217 - 206 - 6510_          **Pages** _3._

**Message:**

# EXHIBIT
_F_

*****CONFIDENTIALITY NOTICE*****
The documents accompanying this telecopy transmission contain confidential information belonging to the sender that is legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party and is required to destroy the information after its stated need has been fulfilled, unless otherwise required by state law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance of the contents of these documents is strictly prohibited. If you have received this telecopy in error, please notify the sender immediately to arrange for return of these documents.

# University of Illinois Springfield

Center for Academic Success
One University Plaza, MS BRK 482
Springfield, Illinois 62703-5407

February 5, 2016

Jacqueline Tanner
615 Washington St
Beardstown, IL 62618

Dear Tanner:

I am pleased to invite you to indicate your willingness to accept the position of Visiting Academic Coordinator at the University of Illinois at Springfield at an annual salary of $50,000 (monthly salary of $4166.67). Your appointment is January 16, 2016 through August 15, 2016. This will be a twelve (12) month, benefit eligible, 100% time academic professional appointment. An annual performance evaluation will be conducted by the Senior Director of International Programs and Internships. This recommendation for appointment is subject to the approval of the Board of Trustees of the University of Illinois.

If you choose to accept our invitation, please return one copy of the signed acceptance of the terms and conditions of the appointment. Once we have the signed letter of offer and required electronic employment documents, the necessary transaction can be completed and processed so that the Board of Trustees can issue a formal notice of appointment. Your return of this letter of acceptance and completion of other required documents will ensure that your appointment and payroll will be completed in a timely manner.

We are pleased to welcome you to the University of Illinois at Springfield and look forward to having you as a member of our academic professional staff.

Sincerely,

Jonathan GoldbergBelle
Senior Director for International Programs and Internships
Center for Academic Success

cc: Provost & Vice Chancellor for Academic Affairs
    Human Resources

I accept the terms of appointment set forth in this letter.

_____
Signature

_2/5/16_
Date

# UNIVERSITY OF ILLINOIS

## Conditional Hire Acknowledgement and Agreement·

I hereby acknowledge and agree that any offer of employment that has been made to me by the University of Illinois is contingent upon my successful completion of any background checks and other pre-employment assessments that may be required for the position that I have been offered. Because any offer of employment is subject to this contingency, I acknowledge and agree that I cannot act in reliance on the notion, that my employment with the University is assured until that contingency has been fulfilled.

I further acknowledge and agree that the University reserves the right to rescind or withdraw any offer of employment based upon the results of the background checks and other pre-employment assessments. I acknowledge and agree that, if for some reason I am permitted to begin employment prior to the completion of any required checks or assessments, the University reserves the right to immediately terminate that employment without any prior notice based upon the results of those checks or assessments. Furthermore, if the contingency to successfully complete any requisite background checks and other pre-employment assessments is not fulfilled, I acknowledge and agree that I am not entitled, and hereby waive any right that I may have, to any notice rights or rights to continued employment that may be afforded to employees under University policy or statute.

I understand that I may request a copy of any reports obtained by the University that relate to me, and that I may challenge the accuracy and completeness of the report, by contacting the entity that generated or created the report if I elect to challenge the report in the manner permitted under state law. I also understand that I may be required to submit a finger-print based check for a criminal conviction if I should seek to challenge the accuracy or completeness of a criminal records report in that manner.

_Jacqueline Tanner_
Name (Please Print)

_2/5/16_
Date

_[signature]_
Signature

E-FILED
Thursday, 30 November, 2017  03:43:17 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| JACQUELINE TANNER, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.: 2017-cv-3039 |
| | ) |
| UNIVERSITY OF ILLINOIS, and | ) |
| BOARD OF TRUSTEES OF THE | ) |
| UNIVERSITY OF ILLINOIS, | ) |
| | ) JURY TRIAL |
| Defendant(s). | )  DEMANDED |

### PROOF OF SERVICE

I hereby certify, on November 30, 2017, the **Second Amended Complaint, and Exhibits and Certificate of Service** were electronically filed with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following CM/ECF participant(s):

Theresa M. Powell
IL ARDC #: 6230402
HEYL, ROYSTER, VOELKER & ALLEN
3731 Wabash Avenue
Springfield, IL 62711-6261
Phone: 217.522.8822, Ext. 2222
Fax: 217.523.3902
Email: tpowell@heylroyster.com

Brian M. Smith
IL ARDC #6293822
HEYL, ROYSTER, VOELKER & ALLEN
301 N. Neil St., Suite 505
P.O. Box 1190
Champaign, IL 61824-1190
217-344-0060 Phone
217-344-9295 Fax
E-mail: bsmith@heylroyster.com

The undersigned attorney hereby certifies that on November 30, 2017, she served copies of the Second Amended Complaint, Exhibits and the Proof of Service upon the following by first-class mail, postage prepaid:

None

Respectfully Submitted,
By: /s/Mona Ahsan
S. Mona Ahsan #6236610
Attorney for Plaintiff
Law Office of Mona Ahsan
2901 Wildcat Court
Springfield, Il 62711
410-507-4443
mona@ahsan-law.com

/s/Kathryn E. Eisenhart
Kathryn E. Eisenhart #6183716
Attorney for Plaintiff
Eisenhart Law Office
17 Hawthorne Lane
Springfield, IL 62712
217-679-6410
eisenhartlawoffice@gmail.com