E-FILED
Friday, 16 March, 2018  08:23:16 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT FOR THE  CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JACQUELINE TANNER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.: 17 C 3039** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITYOF ILLINOIS;** | ) | |
| **KAREN MORANSKI,** | ) | |
| **Associate Vice-Chancellor, in her** | ) | |
| **Individual Capacity; and** | ) | |
| **JONATHAN GOLDBERGBELLE,** | ) | |
| **Senior Director of International** | ) | |
| **Programs and Internships, in his** | ) | **JURY TRIAL** |
| **Individual Capacity; and** | ) | **DEMANDED** |
| **LAURA ALEXANDER,** | ) | |
| **Senior Director** | ) | |
| **of Human Resources, in her** | ) | |
| **Individual Capacity; and** | ) | |
| **DONNA MCNEELY, Director of** | ) | |
| **University Ethics and Compliance Office,** | ) | |
| **in her Individual Capacity and** | ) | |
| **all others known or unknown,** | ) | |
| | ) | |
| **Defendant(s).** | ) | |

## THIRD AMENDED COMPLAINT AT LAW

Now comes, Plaintiff, Jacqueline Tanner, by and through her attorneys of record, S. Mona Ahsan and

Kathryn E. Eisenhart and for her Complaint at Law, states as follows:

## NATURE OF THE ACTION

1.      This action is brought to remedy unlawful discrimination practices under Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; violation of Title VI of the Civil Rights of

1964; and violation of the Illinois Civil Rights Act. Plaintiff seeks damages including, but not limited

to: back pay and reinstatement to her prior position, other make- whole relief, compensatory damages

including loss of professional reputation and emotional distress against all Defendants, and punitive

damages against Defendants Moranski, GoldbergBelle, Laura Alexander and McNeely.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, and 42 U.S.C.

§2000e- 5(f)(3). Supplemental jurisdiction is conferred by 28 U.S.C. §1367 for Plaintiff's state law causes

of action.

3.      Venue is proper in the Springfield Division of the Central District of Illinois because the

employment practices hereafter alleged to be unlawful were committed within this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.   Plaintiff has exhausted all of her administrative remedies prior to bringing this lawsuit.

5.   Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") and received a Right to Sue Letter from the EEOC on Nov 21, 2016, a true and

correct copy of which is attached as Plaintiff's EXHIBIT A. The Right to Sue Letter was issued as a

result of the charge of discrimination filed by the Plaintiff and received by the EEOC on May 11, 2016,

a true and correct copy of which is attached as Plaintiff's EXHIBIT B. All allegations of the charges

and exhibits are incorporated by reference hereto.

## PARTIES

6.   Plaintiff, Jacqueline Tanner is a Citizen of the United States who, at the time of the events in

question, resides in Cass County, Illinois.

7.   Plaintiff is an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq*.

8.  During all relevant times, Defendants, Board of Trustees of the University of Illinois, hereafter referred to as "The University" or "University", constitutes a corporation whose missions include teaching, research, and public service in many academic disciplines.

9.  The University is a covered entity within the meaning of the Civil Rights Act of 1964. The University is an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

10.  At all relevant times, Defendant Karen Moranski hereafter referred to as "Moranski" was the Associate Vice-Chancellor of Undergraduate Education at the University of Illinois Springfield (UIS).

11.  At all relevant times, Defendant Jonathan GoldbergBelle hereafter referred to as "GoldbergBelle" was the Senior Director of International Programs and Internships at University of Illinois Springfield (UIS).

12.  At all relevant times, Defendant Laura Alexander hereafter referred to as "Laura Alexander" was the Senior Director of Human Resources at University of Illinois Springfield (UIS).

13.  At all relevant times, Defendant Donna McNeely hereafter referred to as "McNeely" was the Director of the University Ethics and Compliance Office at University of Illinois.

## STATEMENT OF FACTS

14.  Plaintiff began her employment with the University of Illinois Springfield (University) as a part time Adjunct Instructor on August 16, 2011, to teach in the Intensive English Program (IEP) at the Center for Teaching and Learning (CTL). The Intensive English Program (IEP) was located within the CTL which also consisted of university wide tutoring programs. At this time, CTL was in College of Liberal Arts and Sciences (CLAS) and the Dean of CLAS, James

Ermatinger (Dean) was in charge of IEP.

15. August 16, 2011, Plaintiff was first hired by Ms. Dana Atwell, Associate Director ESL Coordinator, hereafter "Atwell" who remained her immediate supervisor until  June 2013, when Atwell left the program. From July 2013 through April 27, 2016, Driss El-Akrich, Interim Director of IEP, hereafter "El-Akrich" was her immediate supervisor.

16. The purpose of an Intensive English Program (IEP) is to provide high quality teaching of English to speakers of other languages. That is to provide non-native speakers the language skills they need to study at an American university.

17. The courses in IEP are non-credit bearing and completion of the program doesn't guarantee admission into the University. Students need to receive a passing score on an English proficiency test to gain admission into the University. They may take the University examination, Michigan English Language Institute College English Test (MELICET), offered each semester or an acceptable test from an outside source such as, Test of English as a Foreign Language (TOEFL).

18. Therefore, the purpose of IEP is to prepare these non-native speakers to pass one of the aforementioned tests in order to be admitted into the University.

19. It was the University's policy that successful completion of the IEP curriculum did not fulfill the English proficiency requirements for international students; instead, students were required to take the aforementioned tests to enroll in the University.

20. Plaintiff is a qualified professional in second language learning with 25 years of second language learning experience. She has a degree in Foreign Language and training in English as a Second Language teaching. Additionally, she has experience teaching college level English  Composition. She also has 15 years of experience teaching in IEP/ESL programs. Prior to coming to University she taught at Western Illinois University's (WIU) accredited ESL

program and is familiar with the standards for IEP accreditation.

21.     From August 16, 2011, until January 16, 2014, Plaintiff was a part-time Adjunct Instructor.

22.     In January 2014, Plaintiff informed El-Akrich, who informed the Dean, that Plaintiff had been offered a full time ESL lecturer position with benefits at WIU and the she was going to leave UIS to take the WIU position.

23.     On January 16, 2014, Plaintiff was promoted to full time faculty position with benefits, given a raise, the raise was more than what WIU had offered Plaintiff, rehired as a Visiting Clinical Instructor for a 12 month term with allowable vacations and given "special

responsibilities." This was a twelve month position with vacations so that Plaintiff could work all year on her "special responsibilities." The "special responsibilities" were to develop guidelines, procedures and the core curriculum and assessments for the Commission on English Language Program (CEA) accreditation for the Intensive English Program (IEP) at UIS.

24.     Plaintiff's qualifications and experiences in her previous accredited IEP programs where Plaintiff had worked to develop materials, curriculum and assessments per CEA guidelines, for CEA reaccreditation, in accredited Intensive English Programs (IEP) were the primary reason why she was given the "special responsibilities." Moreover, Plaintiff also had extensive expertise in English Composition and Writing. Plaintiff had also successfully developed the ESL level 6 curriculum for UIS under Atwell, which ended up becoming a University course for credit. Plaintiff had also successfully researched and developed methods and materials to improve second language learners' reading and writing skills at WIU and twice Plaintiff had the honor of presenting her research at the Illinois Teachers of English to Speakers of Other Languages (TESOL) conferences; (1) 2009—"Children and Young Adult Literature for the Adult ESL Learner" and (2) 2010—"Achieving Fluency through Literature."

25.     TESOL is a national and an international association of professionals advancing the quality of English language teaching through professional development, research, standards, and advocacy.

26. Plaintiff's main job under the "special responsibilities" was to develop the core curriculum, methods of assessments and policies and procedures as required by the Commission on English Language Program Accreditation (CEA) for the IEP Department. It was the University's plan to obtain CEA accreditation for the IEP and to meet the same standards as the IEP/ESL Programs at the University's Chicago and Urbana campuses.

27. In January 2014, Plaintiff's immediate supervisor was Driss El-Akrich, Interim Director of IEP, who reported to the Dean of CLAS.

28. In March of 2013, before Atwell left, El-Akrich was sent as University liaison to the Saudi Arabian Cultural Mission (SACM) in Washington D.C., because he was a native Arabic speaker, Muslim, and the fact that he understood the Arabic culture, and the needs of Saudi

students, in addition, to the requirements of the University. He was sent to SACM to request that the University and the IEP department be placed on SACM's list of approved colleges. This visit was approved by the Dean.

29. SACM provides scholarships and stipends for Saudi students, but only if the students attend Universities and Programs on the list approved by SACM. The Dean and El-Akrich believed such approval would increase enrollment and add diversity at the University. El-Akrich obtained approval for the University and IEP from SACM the same day as his visit.

30. Based on the approval from SACM the IEP grew from about 8 – 10 students to about 55 – 60 students per semester over the next two years.

31. The faculty members increased from 3 to 9.

32. In 2014, it was decided by the Dean with the support and approval of the Provost and Vice-Chancellor, Lynn Pardie, (Provost) that the IEP should seek CEA accreditation.

33. Based upon the growth of the IEP and the effort to obtain CEA accreditation, the Dean

requested that three full-time faculty be hired. This request was approved.

34. On July 1, 2015, the IEP underwent a re-organization; and on that date it was no longer part of CLAS but was part of the Center for Academic Success (CAS) and under Defendant GoldbergBelle, the Senior Director of International Programs and Internships. GoldbergBelle reported directly to Defendant Moranski, Associate Vice-Chancellor of Undergraduate Education. However, El-Akrich, as the Interim Director of IEP, remained Plaintiff's immediate supervisor.

35. Prior to IEP being transferred to CAS, an assessment of the IEP was done by GoldbergBelle. The Provost wanted all the departments under Center for Academic Success (CAS) assessed. IEP was scheduled to be the first assessed because it had such rapid growth.

36. GoldbergBelle focused his assessment interview with Plaintiff on student attendance. Plaintiff explained to GoldbergBelle that El-Akrich followed the same guidelines as had his predecessor, Atwell. When students missed classes all teachers reported these absences to El- Akrich. If there was an issue and El-Akrich was not able to contact the student, he would ask the International Student Services (ISS) for assistance. This had been the practice under Atwell.

37. Plaintiff explained to GoldbergBelle that CEA guidelines for assessing students were based on direct evidence demonstrating how well a student met the student's learning outcomes in a given course or at a given level. Direct evidence included standardized tests, comprehensive exams, portfolios, rubrics, or scales, but did not include attendance.

38. On or about August 3, 2015, Plaintiff reported to Moranski discriminatory behavior by GoldbergBelle and his Program Coordinator, Barbara Sykes, against El-Akrich. This complaint dealt specifically with discriminatory actions against El-Akrich and the Mexican exchange students from the Proyecta program. The Proyecta program was a short term program for Mexican students to come to the University for a month to study English. It was a program initiated by President Obama and the Mexican

government.

39.    During that meeting, Plaintiff reported that it was her opinion that GoldbergBelle was

treating El-Akrich very differently than his white, female predecessor and that it was her opinion that

such treatment was based upon El-Akrich's national origin, race and religion. Similarly, in Spring

2015, immediately after the assessment interviews by GoldbergBelle, Plaintiff had reported to the

Dean that she was concerned GoldbergBelle was disregarding  Al-Ekrich and discrimination against

him because of his race, religion and national origin. On the Dean's instruction, Plaintiff sent an

email, explaining the IEP Department including a description of Al-Ekrich's  job duties and his

achievements  in growing the IEP Department, to GoldbergBelle and the Assessment Committee

with a carbon copy to the Dean and Moranski.

40.    Moranski did not investigate the complaints of discrimination.

41.    On October 21, 2015, Plaintiff reported discrimination against Middle Eastern Muslim/Arab

students by GoldbergBelle and two IEP adjunct instructors to Ms. Lucia Vasquez, (Vasquez)

Assistant Dean of the College of Liberal Arts and Sciences:

a.    Specifically, Plaintiff reported that GoldbergBelle was fixated on student absences

specifically those of Middle Eastern/Arab Muslim students and insisted that teachers report such

absences directly to him, not to El-Akrich, in contravention of the practices of IEP and the CEA

guidelines.

b.    Plaintiff reported to Vasquez that GoldbergBelle made statements about a Middle

Eastern/Arab Muslim student who, because of his absences from one of the classes, should be

deported. Yet, GoldbergBelle did not have similar concerns for two Chinese students who did not

attend classes for almost a semester.

c.      Sue Alexander (Sue Alexander) and Rebecca Damery (Damery), adjunct instructors in IEP, reported student absences only to GoldbergBelle. El-Akrich was uniformed of this arrangement and thus uninformed of student absences.

d.      GoldbergBelle and his staff treated El-Akrich very differently than his white, female, predecessor Atwell, including keeping El-Akrich out of the information loop necessary for him to perform his duties as Interim Director.

e.      Plaintiff noted that there was a disparity between the grades and progression reports received by two Middle Eastern/Arab Muslim students and a Vietnamese student in Sue Alexander's class. All three students had failing grades in Sue Alexander's class but Sue Alexander had promoted the Vietnamese student up to the next level, but did not promote the Middle Eastern/Arab Muslim students. Plaintiff had all three students in her class and based upon their test grades, which measured proficiency, she determined all three should move up to the next level.

f.      Damery refused to allow a Middle Eastern/Arab Muslim student to attend her class, even though he was on her class roster. She ordered him to leave her class and to bring a note from the IEP office to verify that he was correctly placed in her class; even though, she knew that the IEP office wasn't staffed.

g.      However, on the same day, Damery allowed a Chinese student to remain in class, even though there was a question as to whether this student was placed at the correct class level. This Chinese student was not ordered to get a note from the IEP office to verify that she was properly placed.

h.      This Middle Eastern/Arab Muslim student complained to Plaintiff about Damery's treatment of removing him from her class even when he was on her roster. Plaintiff

reported the complaint to El-Akrich.

42.    Moranski was angry when she became aware that Plaintiff had spoken to Vasquez in the Dean's office and told El-Akrich that Plaintiff should not have gone out of the chain of command to report the discrimination.

43.    On or about November 11, 2015, Plaintiff met with Moranski,  Moranski came to Plaintiff's office, Plaintiff apologized to her about going out of the chain of command to Vasquez, and reported the aforementioned incidents of discrimination she had discussed with Vasquez in the Dean's office. Plaintiff specifically remembers informing Moranski that the, "Saudi students were being targeted." Plaintiff also reported that GoldbergBelle  was not following established procedures as per CEA guidelines—that he was obtaining attendances and grades of Saudi students directly from teachers, and also regarding routine purchases, p-cards and TESOL membership for the department GoldbergBelle and his staff were keeping El-Akrich, Interim Director, out of the information loop.

44.    On November 13, 2015, students came to Plaintiff's office to complain about treatment by certain IEP faculty including Sue Alexander and Damery. Plaintiff took notes, typed up the complaints and sent them to El-Akrich.

45.    Shortly thereafter, on or about November 24, 2015, El-Akrich reported the students' complaints of discrimination to Moranski and GoldbergBelle during a scheduled bi-weekly meeting. El-Akrich also raised concerns about the inexperience of the present IEP faculty in not previously having taught in CEA accredited programs, their inability to comprehend the "proficiency" standard regarding the promotion of students in IEP per CEA and student complaints. El-Akrich suggested hiring faculty with prior teaching experience in a CEA accredited programs would better serve the program. Both GoldbergBelle and Moranski agreed to hire new instructors, who had experience in teaching ESL in a CEA accredited program, for the upcoming term.

46.     In December 2015, as a result of El-Akrich's understanding of his instructions from

Moranski and GoldbergBelle, he had Plaintiff draft a "preliminary" teaching and course

schedule for Spring 2016. This was done specifically on GoldbergBelle's insistence that he needed a

schedule prior to December 30, 2015. Normally, schedules weren't drafted until the beginning of

January when enrollment is known. However, because of GoldbergBelle's insistence, Plaintiff

submitted a preliminary schedule to El-Akrich in December 2015. As directed that schedule did not

include Sue Alexander or Damery.

47.     On December 23, 2015, Plaintiff was informed by El-Akrich that Moranski had decided

to give Sue Alexander and Damery one course each for the Spring Term and that each should

be added to the schedule. Plaintiff amended the schedule, as requested, and sent it to El-Akrich for

submission to Moranski and GoldbergBelle.

48.   In an email shared with Plaintiff on or about December 23, 2015, Moranski stated that it was her

decision to determine who was going to teach and that Sue Alexander and Damery were each to have a

class. (See Plaintiff's EXHIBIT C.)

49.   On February 2, 2016, Plaintiff was told by Moranski that Plaintiff was being promoted to the

position of "Visiting Academic Coordinator" and that it was a position especially created for Plaintiff—it

hadn't existed before. Plaintiff understood this visiting position was similar to her prior position of

"visiting clinical instructor" and could be held only for three years as per University's rules and/or

statutes. She had been informed that one can only stay in that visiting status for three years until there is a

formal search for that title. However, the University could retain that person with the visiting status

provided  he or she was given a different title/position.

50.   On February 2, 2016, Plaintiff received an email request from Donna McNeely, Executive

Director of University Office of Ethics and Compliance, to meet with her so she could better

understand IEP. (See Plaintiff's Exhibit D)

51.   On February 3, 2016, Plaintiff, met with McNeely and reported the discrimination against

Middle Eastern/Arab Muslim students by Sue Alexander, Damery and GoldbergBelle. At the meeting

were Defendant McNeely and Traci Roth, Associate Director of Ethics and Compliance. Plaintiff also

told McNeely that the complaints by Middle Eastern/Arab Muslim students had been previously

reported to Moranski and GoldbergBelle.

52.   Plaintiff also informed McNeely about the discrimination against El-Akrich by

GoldbergBelle and his staff. Plaintiff informed McNeely that she had gone to Vasquez in the

Dean's office and also reported the aforementioned discrimination and that she had also informed

Moranski about the discrimination.

53.   Before, during and after this meeting until she met Laura Alexander on March 3, 2016,

Plaintiff was never informed that the meeting with McNeely in Ethics and Compliance

concerned allegations of retaliation against her and El-Akrich by Sue Alexander and Damery.

54.   Before, during and after this meeting, Plaintiff was not aware nor informed that she

was under investigation for any "retaliation" or "ethics violations" by any of the Defendants

until February 29, 2016, when she was put on administrative leave.

55.   On February 5, 2016, a Friday, Plaintiff was informed in the afternoon that her contract was

ready. Linette Hughes, (Linette) Business Administrative Associate for the Center for Academic

Success, contacted Plaintiff and told Plaintiff to sign and fax the contract that same day or lose all her

benefits.

56.   This contract was shortened from a normal and customary twelve month term to a seven month

term—from January 16, 2016 until August 15, 2016. It also did not include a raise in salary; despite the

fact, Plaintiff was promoted to an Academic Coordinator and given more responsibilities. (See Plaintiff's Exhibit F)

57.     At noon on Monday February 29, 2016, Moranski and GoldbergBelle met with Plaintiff and handed her a letter stating that McNeely had found her to have engaged in retaliation and that she was being placed on administrative leave effective immediately. Plaintiff was told to hand in her University credit cards and keys to her office and leave the campus. She was told that she was to have no contact with anyone from the University including her supervisor. (See Plaintiff's Exhibit E)

58.     Plaintiff was told that she would have a chance to refute the charges in a meeting, in three days, on Thursday, March 3, 3016, with the Director of Human Resources, Laura Alexander (Laura Alexander), and Moranski at the Human Resources office. However, Plaintiff was not provided any information regarding the nature of the supposed retaliation; who had filed the charges, what was the nature of theses retaliation charges, when were they filed and why hadn't she been informed about these allegations earlier during the investigations?

59.     Plaintiff wasn't given a meaningful opportunity to prepare her response.

60.     On March 3, 2016, Plaintiff met with Defendants Laura Alexander and Moranski. At that time, she was informed of the allegations of retaliation made by Sue Alexander, Damery and Sarah Jones – they claimed retaliation because each of them had not been on the preliminary draft of the Spring 2016 schedule that Plaintiff had created as directed. They also claimed retaliation because in the final schedule their hours were reduced.To Plaintiff's knowledge, only Moranski, GoldbergBelle and El-Akrich were privy to the preliminary schedule—it wasn't supposed to be shared with the staff until its final approval by GoldbergBelle and Moranski. The final schedule, ordered and approved by Moranski, had all three instructors assigned at least one class as per Moranski's decision.

61.     Plaintiff did not have the authority to offer, change terms of or sign contracts; she just drafted

the schedules per instructions from El-Akrich who was directed/ordered by Moranski, the final decision maker, whom to hire for Spring 2016. (See Plaintiff's EXHIBIT C.)

62.     As Plaintiff was not given any information i.e., meaningful notice about the allegations against her prior to this meeting, she was unable to provide an effective defense. During the meeting, all of Laura Alexander's questions to Plaintiff were solely concerned with El- Akrich and what he had said and done. Most of the questions did not pertain to Plaintiff or her conduct. Plaintiff informed Laura Alexander about Middle Eastern/Arab Muslim students' complaints against Sue Alexander and Damery.

64.     On March 18, 2015, Plaintiff received a Recommendation letter from Laura Alexander, via an email from Moranski. Laura Alexander determined that Plaintiff had retaliated against the adjuncts Sue Alexander and Damery. One of the options recommended was immediate termination.

65.     On March 21, 2016, Plaintiff verbally reported to Deanie Brown, (Brown) Associate Chancellor, Office of Access and Equal Opportunity, about the discrimination against El- Akrich by GoldbergBelle, the discrimination against the Middle Eastern/Arab Muslim students, and the pre- textual retaliation claim brought against her for reporting the discrimination.

66.     On March 22, 2016, Plaintiff put her claims of discrimination against El-Akrich and the Middle Eastern/Arab Muslim students and the retaliation against her in writing via an email to Brown.

67.     On April 15, 2016, Plaintiff again met with Brown. At this point, Plaintiff was still on administrative leave. Plaintiff told Brown she was considering filing a complaint with the EEOC. Brown asked her not to file a formal complaint while she advocated to remedy Plaintiff's situation.

68.     On April 27, 2016, Plaintiff received a letter from Moranski stating she could return to work in a limited capacity until the end of her contract, however, she was not cleared of any

wrongdoing and she could not return to IEP. She was informed she could not speak to any IEP students, faculty or staff and that her contract would not be renewed.

69.     For the period from May 4, 2016, through August 15, 2016, Plaintiff was directed/allowed to work in the College of Business and Management from home.

70.     On August 2, 2016, Plaintiff was finally allowed into her former office to collect her personal belongings. She had been requesting Moranski to enter her office to retrieve her personal belongings for over five months. Upon entering, Plaintiff found that two bookcases, which had been filled with her books and reference materials, were empty. Many other items belonging to Plaintiff were missing from her desk and file cabinet. Moranski opened the offices of other IEP teachers so that Plaintiff could look for her books. Plaintiff filed a police report regarding the theft of her personal property.

71.     Plaintiff has been told that there are rumors in the IEP Department that Plaintiff and El- Akrich were dismissed because of their illegal dealings with the "Gary" Yuesong Yang. Yang had been hired by the University to recruit Chinese students as a "Student Advisor" in 2013 –some of his recruited students would enroll in the IEP department. Recently, he was charged with raping a Chinese student.

72.     The wrongful Ethics violation on Plaintiff's record creates a black mark against her professionally and has caused significant reputational harm to Plaintiff's career and professional reputation. Major university job applications usually inquire whether the applicant has ever been a subject of an ethics violation. This has caused Plaintiff to lose tangible employment opportunities.

73.     When the position of Director of IEP was advertised Plaintiff wasn't allowed to apply for the position, contact anyone at UIS nor come on campus without Moranski's approval, even though, Plaintiff was fully qualified for the position and would have liked to apply. The new position was posted within a few days after Plaintiff received Laura Alexander's recommendation of "immediate termination" on

March 18, 2016, and it was closed while Plaintiff awaited Moranski's final determination received on April 27, 2016.

74.     Plaintiff applied for two full time jobs at the CBM department at UIS; even though she was qualified, she was not considered.

75.   Since August 15, 2016, Plaintiff has been unable to obtain an academic position at UIS or at the numerous other universities where Plaintiff has applied such as: Southern Illinois University, McMurray, Illinois State, Lincoln Land Community College, St. Louis University, Culver Stockton, Bradley University, St Charles Community College, Capital University in Ohio, numerous colleges/universities in Pennyslvania area and University of Tampa, Florida.

76.     Plaintiff has been informed not to contact any of her previous colleagues at UIS—even for references. As a direct result of Defendants' actions Plaintiff has faced significant reputational harm and problems listing references on prospective job applications.

77.     Plaintiff was a full time visiting academic coordinator and then, per Moranski's direction, Plaintiff worked in CBM, until the expiration of her contract, correcting exams. Later, she worked as an adjunct part time ESL writing assistant in the College of Business and Management (CBM) at UIS for one semester. This is seen as a demotion by prospective

employers and has significantly harmed Plaintiff's professional reputation and her career prospects.

78.     After Plaintiff had worked in Fall of 2016 for the CBM, she was told she had done a good job and was offered a part time position for January 2017. After Plaintiff requested her personnel file from UIS, this offer was rescinded.

79. Plaintiff remains without a permanent job and without health insurance and benefits. She is unable to procure a full time academic position in her field in the United States and has been

forced to, leave her husband and grandchildren who depend on her, and go overseas to teach ESL for a short term assignment. She had suffered emotional distress and loss of professional reputation due to Defendants' actions.

## COUNT I
## RETALIATION VIOLATION OF TITLE VII
### *Against the Board of Trustees of the University of Illinois*

80.     Plaintiff repeats and re-alleges all of the foregoing allegations 1-79 as though they were contained herein.

81.     Title VII makes it unlawful for an employer to discriminate against an employee because he or she has opposed any practice made unlawful by Title VII, or if he or she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

82.     Throughout her employment, Plaintiff performed her job duties in a satisfactory manner consistent with the University's reasonable expectations.

Plaintiff asserts that being placed on administrative leave, being removed from the IEP and having her contract term shortened, without her consent and without consideration, was the result of retaliation against her by the Defendants because she complained about the Middle Eastern/Arab Muslim discrimination by some of the IEP instructors and perpetuated by the actions of GoldbergBelle and Moranski.

84.     There is a casual connection between the protected activity and the adverse employment action.

85.     The Defendant has subjected Plaintiff to the above-described less favorable terms and conditions of employment, failed to take proper steps to address Plaintiff's complaints of discrimination; instead, placed her on administrative leave and then removed her to College of Business until the termination of her contract because of Plaintiff's protected activity in violation of Title VII.

86.     As a direct and proximate result of one or more of the above acts of retaliation as described

above, Plaintiff has sustained damages equal to lost monetary damages, has suffered substantial

embarrassment and damage to her professional reputation, emotional distress damages, conversion of

personal property from her office and is entitled to compensatory

damages, as well as attorneys' fees and costs.

**COUNT II**
**DENIAL OF PROCEDURAL DUE PROCESS**
**(Fourteenth Amendment of U.S. Constitution and 42 U.S.C. § 1983)**
*Against Defendants GoldbergBelle, Moranski, Laura Alexander and McNeely*
*in their Individual Capacity*

87.    This Count has been dismissed by this Court without prejudice and with leave to amend. In the interest of

Justice, Plaintiff reserves the right to amend after discovery.

**COUNT III**
**FIRST AMENDMENT**
**(First Amendment of U.S. Constitution and 42 U.S.C. § 1983)**
*Against Defendants GoldbergBelle, Moranski, Laura Alexander and McNeely*
*in their Individual Capacity*

88.    This Count has been dismissed by this Court without prejudice with leave to amend. In the interest of Justice,

Plaintiff reserves the right to amend after discovery.

**COUNT IV**
**CONSPIRACY UNDER SECTION 1985**
**(42 U.S.C.  §1983 and 42 U.S.C.§1985)**
*Against Defendants GoldbergBelle, Moranski, Laura Alexander and McNeely*
*in their Individual Capacity*

89.    This Count has been dismissed by this Court without prejudice with leave to amend. In the interest of Justice,

Plaintiff reserves the right to amend after discovery.

**COUNT V**
**Title VI Retaliation**
*Against the Board of Trustees of the University of Illinois*

90.      Plaintiff repeats and re-alleges paragraphs 1 – 79.

91.      Title VI of the Civil Rights Act of 1964 prohibits race and national origin

discrimination in federally assisted programs makes it unlawful for an employer to

discriminate against an employee because he or she has opposed any practice made unlawful

by Title VI. The regulation prohibits retaliation for the purpose of interfering with any right or

privilege secured by section 601 of the Act.

92.      Plaintiff made complains about discrimination against Middle Eastern/Arab Muslim students and

concerns of discrimination against El-Akrich, a Moroccan/Arab Muslim, by actions perpetuated by

Defendants. Plaintiff was exercising her right to free speech as guaranteed by the  First Amendment of

the U.S. Constitution. Her complaints never impeded her duties at the University; instead, they raised

awareness of issues of public concern.

93.      Plaintiff's complaints of public concerns were distorted and misconstrued by Defendants.
Plaintiff's protected speech was the motivational factor for Defendant's retaliation against her. In
retaliation to Plaintiff's repeated complaints regarding racial, national origin and religious
discrimination by Defendant, Plaintiff was: put on administrative leave, banned from her office, told to
turn in all her keys, and banned from all contact with faculty, staff and students. Plaintiff was banned
from entering University premises unless approved by Moranski. Initially, Laura Alexander
recommended "immediate termination." Later, Moranski changed it to allow Plaintiff, still barred from
campus, staff, faculty and students, to work from home until her contract expired.

94.      The University's retaliatory actions in response to Plaintiff's protected speech have a chilling
effect that acts as a deterrent to free speech.

95.      The pretexual retaliation against Plaintiff by the University directly resulted in substantial and

irreparable harm to Plaintiff including loss of income and benefits, out-of-pocket expenses, loss of

future earnings, loss of professional reputation and other compensatory damages.

### COUNT VI
### Retaliation under Illinois Civil Rights Act (ICRA) 740 ILCS 23/5(a)
#### *Against the Board of Trustees of the University of Illinois*

96.  Plaintiff repeats and re-alleges paragraphs 1 – 79.

97.  ICRA provides, in relevant part, that no unit of local government shall "exclude a person from participation in,

deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of

that person's race, color, national origin, or gender." 740 ILCS 23/5(a).

98.    Plaintiff made complains about discrimination against Middle Eastern/Arab Muslim students

and concerns of discrimination against El-Akrich, a Moroccan/Arab Muslim, by actions perpetuated

by Defendants. Plaintiff was exercising her right to free speech as guaranteed by the First Amendment

of the U.S. Constitution. Her complaints never impeded her duties at the University; instead, they

raised awareness of issues of public concern.

99.    Plaintiff's complaints of public concerns were distorted and misconstrued by Defendant and its

agents and employees of the University. Plaintiff's protected speech was the motivational factor for

Defendant's retaliation against her. In retaliation to Plaintiff's repeated complaints regarding racial,

national origin and religious discrimination by Defendants, Plaintiff was: put on administrative leave,

banned from her office, told to turn in all her keys, and banned from all contact with faculty, staff and

students. Plaintiff was banned from entering University premises unless approved by Moranski.

Initially, Laura Alexander recommended "immediate termination."  Later, Moranski changed it to

allow Plaintiff, still barred from campus, staff, faculty and students, to work from home until her

contract expired.

100.    The University's retaliatory actions in response to Plaintiff's protected speech have a chilling

effect that acts as a deterrent to free speech.

101.    The pretexual retaliation against Plaintiff by the University directly resulted in substantial and

irreparable harm to Plaintiff including loss of income and benefits, out-of-pocket expenses, loss of

future earnings, loss of professional reputation and other compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Award damages to Plaintiff for loss of front pay and benefits incurred as a result of the

retaliation against her as alleged in this complaint, pursuant to and within the statutory limits

under Title VII of the Civil Rights Act as well as incidental, consequential damages;

B.    Award damages under Title VI for loss of income and benefits as well as compensatory

damages;

C.    Award damages under  ICRA for loss of income and benefits and compensatory

damages;

D.    Assess against the University and in favor of the Plaintiff such liquidated and exemplary

damages as may be provided by law for the willful violations of the law committed by it;

E.    Award Plaintiff pre-judgment interest for the defined sum of wages and benefits lost;

F.    Grant Plaintiff reasonable attorneys' fees, costs, and fees for experts;

G.    Grant Plaintiff the right to amend the complaint after discovery regarding Counts II, III and IV; and

H.    Grant Plaintiff such other relief as this Court deems necessary and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

JACQUELINE TANNER

Plaintiff

By s/S.Mona Ahsan
S. Mona Ahsan Attorney for the
Plaintiff
S. Mona Ahsan # 6236610 Law
Office of Mona Ahsan 2901
Wildcat Court Springfield, Il 62711
410-507-4443
mona@ahsan-law.com

s/Kathryn E. Eisenhart Kathryn
E. Eisenhart Attorney for Plaintiff
Kathryn E. Eisenhart #6183716
Eisenhart Law Office
17 Hawthorne Lane
Springfield, IL 62712
217-679-6410
esenhartlawoffice@gmail.com